**[J-81-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 7 WAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered June 5, 2017 at No. |
| | : | 1445 WDA 2016, affirming the |
| v. | : | Judgment of Sentence of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered August 31, 2016 at No. CP- |
| EDWARD THOMAS ADAMS, | : | 02-CR-0002870-2016. |
| | : | |
| Appellant | : | ARGUED: October 24, 2018 |

**OPINION**

**JUSTICE DONOHUE**                              **DECIDED: MARCH 26, 2019**

This discretionary appeal requires the Court to consider once again when an interaction between an ordinary citizen and a law enforcement official ripens from a mere encounter, requiring no level of suspicion, to an investigative detention, which must be supported by reasonable suspicion that criminal activity is afoot. We conclude, based on longstanding precedent of this Court and the United States Supreme Court, that the line is crossed when a reasonable person would not feel free to leave, and that a detention effectuated by police in the interest of officer safety is impermissible in the absence of reasonable suspicion of criminal activity. We therefore reverse the decision of the Superior Court and remand the matter to the trial court for proceedings consistent with this Opinion.

The pertinent facts are largely undisputed. At approximately 2:56 a.m. on January 10, 2016, during a routine patrol, Officer James Falconio of the Pleasant Hills Police Department observed a white Dodge Dart enter a parking lot that served two closed businesses – a hobby store and a pizza shop – and drive behind the buildings. Believing that the vehicle may have made a wrong turn, Officer Falconio waited and watched for the vehicle to exit the parking lot. When it did not, the officer drove into the parking lot and behind the buildings to "simply check[] to see why a car drove behind two dark, closed businesses at [three] o'clock in the morning," as he recognized the potential for "drug activity or an attempted burglary." N.T., 8/25/2016, at 9.

When he arrived behind the buildings, Officer Falconio observed a white Dodge Dart parked behind the pizza shop. The engine was not running and the vehicle's lights were off. Although there were no "no parking" signs,[1] there were also no marked parking spots. Officer Falconio did not believe that this was an area where the public would generally park, but that the area might be used for deliveries and employee parking.

---

[1] The Commonwealth states in its brief that there were posted "no parking" signs behind the buildings. Commonwealth's Brief at 6. The record, however, does not support this contention. Instead, the record reflects the following exchange between defense counsel and Officer Falconio on this point during cross-examination:

> Q And there is parking available back there.
>
> A It's not marked parking. **But you can park back there.**
>
> Q You've seen vehicles parked back there.
>
> A Yes.
>
> Q And **there's no no-parking signs up there.**
>
> A **No.** I haven't seen cars parked there at 3 a.m. too often.

N.T., 8/25/2016, at 22 (emphasis added).

Officer Falconio pulled behind the vehicle in his marked police cruiser but did not activate his overhead lights or siren. He radioed for backup, but prior to backup arriving, he exited his police cruiser and walked over to the parked vehicle. It was late at night in a poorly lit area, and Officer Falconio utilized his flashlight, shining it into the vehicle as he approached. He reached the driver's side door and knocked on the window, at which time the occupant, Appellant Edward Thomas Adams ("Adams"), opened the car door. Officer Falconio pushed the door closed and instructed Adams to roll down his window. According to Officer Falconio, he did not feel safe allowing Adams, who was "not a short guy," to exit his vehicle without another officer present. *Id.* at 21. Adams explained to the officer that he could not open the window because he did not have the keys to the vehicle. Officer Falconio observed a set of keys (which he believed to be the keys to the vehicle) on the floor of the back of the car.[2] Adams remained in his vehicle until backup arrived, which occurred approximately one minute later.

With another officer present, Officer Falconio opened Adams' door and began to speak with him. Adams conveyed that he was the owner of the pizza shop and stated that he had just been inside his business. The officer knew the latter statement was not

---

[2] The Commonwealth contends that Officer Falconio observed the keys in the backseat of the vehicle as he approached Adams, prior to closing the car door. Commonwealth's Brief at 6, 33. The record does not support this assertion. Officer Falconio testified that he shined his flashlight into the rear of the vehicle as he approached to ensure no one was laying down in the backseat. N.T., 8/25/2016, at 24. Although he arguably could have seen the keys at that time, counsel for Adams specifically asked the officer on cross-examination when he observed the keys on the floor of the backseat, and he testified that this occurred simultaneously with when he closed Adams' vehicle door. *Id.* (defense counsel asked the officer whether he observed the keys "before or after you pushed his door closed," and Officer Falconio responded, "As"). The trial court made a factual finding that the officer observed the keys at the time the officer closed the door to the vehicle. *See* Trial Court Opinion, 12/5/2016, at 3. As the record supports that finding of fact, we are bound by it. *Commonwealth v. Valdivia*, 195 A.3d 855, 861 (Pa. 2018).

true, as he had just observed Adams drive into the parking lot. As they spoke, Officer Falconio detected a strong odor of alcohol on Adams' breath and observed that he had glassy eyes and slurred speech. He requested that Adams perform several field sobriety tests, and although "argumentative," Adams complied and failed the tests. *Id.* at 9-10. Officer Falconio then placed him under arrest for suspicion of driving under the influence of alcohol. He transported Adams to Jefferson Regional Hospital, where Adams consented to a blood draw. Adams declined to provide the name of a person who could pick him up, and so he remained in jail until police believed he was sober enough to leave on his own, which occurred around 10:00 that morning.

Adams filed an omnibus pretrial motion asserting, inter alia, that the officer subjected him to an illegal detention in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Of relevance to the case at bar, he contended that his detention by Officer Falconio was not supported by probable cause and/or reasonable suspicion of criminal activity and that all information and evidence obtained following his detention must be suppressed as fruits of the poisonous tree.

The trial court held a hearing on the motion on August 25, 2016, at which Officer Falconio provided the above-recited testimony. The trial court denied suppression, finding that the interaction between Adams and Officer Falconio was a mere encounter that did not convert to an investigative detention until Officer Falconio detected several indicia of intoxication, providing him with reasonable suspicion of criminal activity to support the temporary detention. Regarding Officer Falconio's refusal to allow Adams to open his car door, the trial court found that it was done in the interest of officer safety and

"was not unreasonable under these specific circumstances," as "[t]his was a dark area behind … closed businesses" and "backup arrived one minute later." Trial Court Opinion, 12/5/2016, at 6.

A stipulated bench trial followed immediately thereafter. The trial court convicted Adams of driving under the influence of alcohol[3] and sentenced him to six months of probation and a $300 fine.

Adams appealed to the Superior Court, and a majority of that court affirmed based on the trial court's opinion, finding:

> When Officer Falconio approached the vehicle, a mere encounter ensued, not an investigatory detention. Officer Falconio merely approached a parked vehicle in an empty parking lot at approximately 3:00 a.m. He did not need reasonable suspicion or probable cause to do so. Officer Falconio's subsequent observations, as well as [Adams'] actions, permitted Officer Falconio to transform this mere encounter into an investigatory detention based upon articulable facts that suggested criminal activity might be afoot.

*Commonwealth v. Adams*, 1445 WDA 2016, 2017 WL 2424726, at *2 (Pa. Super. June 5, 2017) (non-precedential decision). Senior Judge Strassburger filed a concurring opinion, which the majority author joined. The concurrence differed from the majority, finding instead that the original mere encounter ripened into an investigative detention when Officer Falconio refused to allow Adams to open his car door because at this point, "only an unreasonable person would feel free to exit the car or drive away."[4] *Id.* at *2

---

[3] 75 Pa.C.S. § 3802(a)(1).

[4] It is difficult to reconcile the Superior Court majority author's joinder in Judge Strassburger's concurrence with the majority's conclusion that the trial court correctly found that no investigative detention occurred until Officer Falconio detected that Adams

(Strassburger, J., concurring). Judge Strassburger further concluded that Officer Falconio had reasonable suspicion of criminal activity to support the investigative detention, and thus, like the majority, would have affirmed the trial court's denial of suppression. "Officer Falconio had reasonable suspicion that criminal activity was afoot based upon the car's lingering presence in a parking lot behind closed businesses around 3 a.m.," and that reasonable suspicion of criminal activity "certainly" arose upon Adams' assertion that "he could not open his car door [sic] because he did not have his car keys, yet his car keys were in plain sight." *Id.*

We granted allowance of appeal to determine whether the courts below erred in concluding that the interaction between Adams and Officer Falconio did not ripen into an investigative detention prior to the officer detecting indicia of intoxication. We review this case mindful that the trial court's findings of fact are binding upon us to the extent they have record support, but we conduct a de novo review of its legal conclusions. *Commonwealth v. Valdivia*, 195 A.3d 855, 861 (Pa. 2018).

The Fourth Amendment to the United States Constitution protects private citizens from unreasonable searches and seizures by government officials.[5] *See Byrd v. United States*, 138 S.Ct. 1518, 1526 (2018). Not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections. "Only

---

was intoxicated. Because this dichotomy does not affect our decision in this matter, we need not discuss it further.

[5] Although Adams mentions Article 1, Section 8 of the Pennsylvania Constitution, he makes no argument specific to the Pennsylvania Constitution. Adams relies almost exclusively on case law decided under the Fourth Amendment. We therefore review this case solely under the Fourth Amendment. *See Commonwealth v. Strader*, 931 A.2d 630, 633 (Pa. 2007).

when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)); *see also Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (recognizing that the central focus of the determination of whether a seizure occurred is whether an individual is somehow "restrained by physical force or show of authority").

We have long recognized three types of interactions that occur between law enforcement and private citizens. The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000). A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way. *See id.* The second type of interaction, an investigative detention, is a temporary detention of a citizen. *I.N.S. v. Delgado*, 466 U.S. 201, 215 (1984); *In the Interest of A.A.*, 195 A.3d 896, 904 (Pa. 2018). This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot. *Brown v. Texas*, 443 U.S. 47, 51 (1979); *Strickler*, 757 A.2d at 889. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. *A.A.*, 195 A.3d at 904. A custodial detention also constitutes a seizure. *Strickler*, 757 A.2d at 889.

No bright lines separate these types of encounters, *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1120 (Pa. 1998), but the United States Supreme Court has established

an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. *Lyles*, 97 A.3d at 302-03. The test, often referred to as the "free to leave test," requires the court to determine "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16.

Adams argues that the interaction with Officer Falconio was an investigative detention from the moment the officer exited the police vehicle and approached his car. Adams' Brief at 11. Alternatively, he asserts that it unquestionably ripened into an investigative detention when the officer "closed the door of [Adams'] vehicle, signaling to him and anyone in his position[] that they were not free to leave." *Id.* at 11.

In its responsive brief, the Commonwealth asserts that the interaction between Adams and Officer Falconio was a mere encounter and did not become an investigative detention until Officer Falconio opened the door to the vehicle and had reasonable suspicion to believe that Adams was driving under the influence of alcohol. Commonwealth's Brief at 13, 27. The Commonwealth argues that the officer's approach was permissible and that his act of closing Adams' door did not escalate the interaction to an investigative detention. *Id.* at 15-17, 23. Without supporting authority, the Commonwealth states that closing Adams' door did not constitute a show of force or intimidation, but instead was for the officer's protection until backup arrived (which

occurred shortly thereafter), rendering it permissible. *Id.* at 23-24. Likening the officer's actions here to an officer requesting that a person remove his hands from his pockets or requiring the occupants of a vehicle to exit the car during a lawful traffic stop, the Commonwealth asserts, "Shutting the vehicle door for approximately one minute until backup officers arrived was within the ambit of acceptable, non-escalatory factors." *Id.* at 26 (citing, inter alia, *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam) (vehicle stop); *Lyles*, 97 A.3d at 306 (hands in pockets)).

We agree with Adams that he was "seized" for Fourth Amendment purposes when Officer Falconio would not allow Adams to exit his vehicle, closing the door as Adams opened it.[6] This action, constituting both an act of physical force and a show of authority, is precisely the type of escalatory factor that compels a finding that a seizure occurred. Officer Falconio confined Adams to his vehicle, and no reasonable person in Adams' shoes would have felt free to leave. In fact, under these circumstances, not only would a reasonable person not feel free to leave, Adams actually could not leave his vehicle and "go about his business." *See Bostick*, 501 U.S. at 437. Moreover, Officer Falconio did not simply request that Adams stay in the car. His action of physically closing the door as Adams was opening it communicated what any reasonable person would understand to be a demand that he remain in the vehicle at that location. *See, cf., Commonwealth v. Au*, 42 A.3d 1002, 1007 n.3 (Pa. 2012) (recognizing that in evaluating whether a person has been seized for Fourth Amendment purposes, "a request obviously differs from a demand"). At that moment, Officer Falconio restrained Adams' freedom to walk away,

---

[6] In light of this conclusion, we need not address Adams' contention that the encounter between Adams and Officer Falconio was an investigative detention from its inception.

and thus Adams was "seized" for Fourth Amendment purposes. *See Terry*, 392 U.S. at 16.

The Commonwealth and the courts below improperly focus, in part, on the duration of the detention that occurred. That the detention was only temporary is irrelevant to our analysis of whether a seizure occurred. An investigative detention, by definition, encompasses only a "brief detention." *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("In *Terry*[], we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."); *Strickler*, 757 A.2d at 888 ("The Fourth Amendment protects against unreasonable searches and seizures, including those entailing only a brief detention."). The Fourth Amendment does not have a time limit; it protects individuals from unreasonable seizures, no matter how brief. *See, e.g., United States v. Brigoni-Ponce*, 422 U.S. 873, 880-82 (1975) (finding an interaction between border patrol officers and individuals in their vehicles during roving-patrol stops and lasting "no more than a minute" to be an investigative detention requiring reasonable suspicion of criminal activity).

The analogies presented for our consideration by the Commonwealth are inapt. An officer's act of closing the door of a person's vehicle as the person begins to open it is not similar to a request that a person remove his hands from his pockets, as the latter request in no way constrains a person's ability to leave the area.[7] Further, although the

---

[7] We further note that in *Lyles*, the case relied upon by the Commonwealth for this proposition, the appellant did not contend on appeal that the officer's request for him to remove his hands from his pockets turned the mere encounter into an investigative detention. Instead, the question before the Court was whether "an officer's request for

Commonwealth is correct that the Fourth Amendment allows an officer to order the occupants of a vehicle to exit during a lawful traffic stop, it ignores that a traffic stop is an investigative detention that itself requires reasonable suspicion or probable cause. *See Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008). In *Mimms*, police initiated a vehicle stop after observing the defendant driving with an expired license plate. The high Court explained that where police have already lawfully and permissibly intruded upon the personal liberty of the vehicle's occupants by conducting the stop of the vehicle and the driver is lawfully detained, the "additional intrusion" of having the individuals exit the vehicle at the officer's direction does not constitute a separate seizure and "can only be described as de minimis." *Mimms*, 434 U.S. at 111.

The key differentiation of the circumstances in the case at bar is that there was no preexisting permissible intrusion or restraint on Adams' liberty. The Commonwealth does not contend, and the record does not support a finding, that Adams was already subjected to a lawful investigative detention at the time Officer Falconio closed the vehicle's door. *See* Commonwealth's Brief at 17-21 (asserting that the interaction began as a mere encounter). Thus, unlike in *Mimms*, Officer Falconio's action was not an additional de minimus intrusion upon a person who police had already lawfully seized.

The Commonwealth further points to this Court's recent decision in *Commonwealth v. Mathis*, 173 A.3d 699 (Pa. 2017), as compelling a finding that Officer Falconio's action did not escalate the interaction to an investigative detention. Commonwealth's Brief at 26-27. In *Mathis*, a majority of this Court concluded that a

---

identification elevated an encounter to an investigative detention unsupported by reasonable suspicion." *Lyles*, 97 A.3d at 300. Thus, for this reason as well, *Lyles* does not provide support for the Commonwealth's contention.

parole agent's statement to a visitor in a parolee's home that he would get the visitor (Mathis) out of the house "as soon as I possibly can," and his request that Mathis move into the front room of the house did not elevate the interaction to an investigative detention. *Mathis*, 173 A.3d at 712-13. At the time of the request, a different parole agent was conversing in another room with the parolee, as there was a smell of burnt marijuana in the house and the agents observed marijuana roaches in an ashtray. The *Mathis* majority found the "relaxed and conversational" tone of the interaction between the parole agent and Mathis to that point, which the Majority deemed "non-confrontational," did not warrant a finding that Mathis had been seized, particularly in light of Mathis' recollection that he believed the parole agent communicated to him an urgency for Mathis to leave the house. *Id.* at 702-03, 713.

In contrast, in the pending matter, there was no interaction, let alone conversation, between Officer Falconio and Adams before the officer prohibited Adams from exiting his vehicle. As stated above, prior thereto, Officer Falconio parked behind Adams' vehicle and approached it, shining a flashlight inside of the vehicle. He then tapped on the window, following which Adam attempted to open the door to engage with the officer, but Officer Falconio closed the door on him so that he could not exit the vehicle. There was no "request" made, and we cannot classify the officer's action here as non-confrontational. While we accept that Officer Falconio may have been concerned for his safety, given Adams' apparent stature and that the officer was alone, a police officer's action of closing the car door on someone as he attempts to exit his vehicle can only be viewed as a show of force and authority. Thus, based on the factual differences between

*Mathis* and the matter at hand, we reject the Commonwealth's claim that *Mathis* is controlling.

There is no question that a reasonable person in Adams' position would not have felt free to leave once Officer Falconio closed his vehicle door on him, and he was thus seized. The courts below erred when they concluded that the interaction was a mere encounter despite this action by the officer. The basis for the courts' conclusion that this did not escalate the interaction to an investigative detention was that they viewed the closing of Adams' vehicle door to be in the interest of officer safety – he was the only officer at the scene and it was dark outside. Trial Court Opinion, 12/5/2016, at 6; *see also Adams*, 2017 WL 2424726, at *2 (affirming based on the trial court's opinion). This is contrary to the law. Pursuant to *Terry* and its progeny, a detention effectuated by police in the name of "officer safety" is not sufficient to permit the detention, as "officer safety" does not overcome or replace the requirement of reasonable suspicion that criminal activity is afoot to support the seizure.

*Terry* marked the first case in which the United States Supreme Court determined that law enforcement officials may briefly detain an individual for questioning and pat down or "frisk" the person based on facts that amount to less than probable cause to arrest. In *Terry*, a police officer observed three men engaging in behavior that caused him to suspect, based on his training and experience, that they were casing a store in preparation to commit a robbery. The officer approached the men and began asking them questions. He then grabbed Terry, one of the three men, and patted down the outer layer of his clothing, which revealed a gun in Terry's coat pocket.

Terry challenged the constitutionality of the interaction under the Fourth Amendment. The high Court recognized the competing interests at play. On the one side, the Fourth Amendment requires a "specific justification for any intrusion upon protected personal security." *Terry*, 392 U.S. at 10-11. On the other, there is a need for flexibility for police to investigate criminal activity and, while in the process of doing so, protect themselves from harm. *Id.* To give proper effect to both of these interests, the Court established a two-part test. First, a brief investigatory detention is permissible only if the police officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. In such circumstances, he or she may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. *Id.* at 30. Second, **during** this brief detention, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat down search "to determine whether the person is in fact carrying a weapon." *Id.* at 24.

In applying this two-part test, the constitutionality of the seizure requires a determination of whether "specific and articulable facts" and the "rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

> The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of

reasonable caution in the belief' that the action taken was appropriate?

*Id.* at 21-22.

In the cases that have followed *Terry* over the last fifty years, the high Court has emphasized that considerations of officer safety must be **preceded** by a finding that the individual was lawfully subjected to an investigative detention, i.e., that the officer had reasonable suspicion that criminal activity was afoot. In *Arizona v. Johnson*, 555 U.S. 323 (2009), for example, the Court reaffirmed its decision in *Terry* as follows:

> Th[is] Court upheld "stop and frisk" as constitutionally permissible if two conditions are met. **First**, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. **Second**, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Id.* at 326-27 (emphasis added). *See also Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (prior to pat down search, the officer must have reasonable suspicion of criminal activity); *Michigan v. Long*, 463 U.S. 1032, 1051-52 (1983) (*Terry* search for weapons of area of vehicle in reach of the individual permissible during lawful vehicle stop where the officer has reasonable suspicion to believe that the individual may be armed and dangerous).

Accordingly, during an investigative detention, police officers may take action, when appropriate, for their own safety or that of the public. Both this Court and the high Court have repeatedly stated that officer safety is a legitimate governmental interest that is worthy of protection. *See, e.g., Terry*, 392 U.S. at 24; *Mimms*, 434 U.S. at 110; *Long*, 463 U.S. at 1052; *Commonwealth v. Zhahir*, 751 A.2d 1153, 1158 (Pa. 2000).

Importantly, however, an investigatory detention may not be premised on officer safety. Instead, safety considerations are relevant only within the confines of a lawful investigative detention based upon the police officer's reasonable suspicion that the person being stopped is committing or has committed a criminal offense. In the absence of such reasonable suspicion (or probable cause), police may not initiate an investigatory detention.

The courts below ignored the first step of the *Terry* test as they never assessed whether Officer Falconio had reasonable suspicion of criminal activity to justify the seizure of Adams. Instead, the courts substituted a finding that the action was permissible in the interest of officer safety in lieu of considering whether the officer had reasonable suspicion of criminal activity. Although an officer's subjective concern for his safety is, of course, a legitimate interest, it does not enter into a Fourth Amendment analysis unless the investigative detention was initially supported by reasonable suspicion of criminal activity. A contrary conclusion would eviscerate the Fourth Amendment since a concern for officer safety is present in nearly all interactions police have with members of the public. *See Roberts v. Louisiana*, 431 U.S. 633, 636 & n.3 (1977) (per curiam) (stating that police "regularly must risk their lives in order to guard the safety of other persons and property," and that police work is inherently dangerous); *Mimms*, 434 U.S. at 110 (recognizing the risk to police that is present when they approach a person seated in a car). Simply put, in the absence of reasonable suspicion of criminal activity justifying an investigative

detention, officer safety is not a permissible basis for police to seize an individual during a mere encounter.[8]

The interaction between Adams and Officer Falconio was an investigative detention when Officer Falconio physically closed Adams' vehicle door as Adams began to open it. Whatever Officer Falconio's reason for not allowing Adams to open his car door, the resulting message was clear – Adams was not free to leave.

Having determined that a seizure occurred, we now consider whether Officer Falconio had reasonable suspicion of criminal activity to support the investigative detention. As stated hereinabove, an investigative detention is constitutionally permissible if an officer identifies "specific and articulable facts" that led the officer to believe that criminal activity was afoot, considered in light of the officer's training and experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Commonwealth v. Cook*, 735 A.2d 673, 676 (Pa. 1999)). "[I]n determining whether the officer acted reasonably …, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

---

[8] Moreover, as it relates to the case at bar, the record does not reflect any immediacy or urgency for Officer Falconio to approach Adams' vehicle and question him. The officer testified that he was concerned for his safety because he was the only officer present at that time, but that he had called for backup, which he knew to be en route to his location when he approached Adams' vehicle. *See* N.T., 8/25/2016, at 21 (Officer Falconio testifying that backup had called to let him know "they were on their way," but had not yet arrived when Adams opened his car door). In the absence of reasonable suspicion that criminal activity was afoot, there was no need for Officer Falconio to approach Adams' vehicle prior to backup arriving.

The Commonwealth contends that if an investigative detention occurred, Officer Falconio had the requisite reasonable suspicion of criminal activity to allow for the seizure, and that the facts of record support this conclusion. In particular, the Commonwealth points out that the officer knew from his patrolling experience that cars were not usually parked behind the rear of the businesses, particularly at 3:00 a.m.[9] Commonwealth's Brief at 33-34. Adams, on the other hand, argues that Officer Falconio did not have the requisite reasonable suspicion of criminal activity to seize him, as the officer had nothing more than an "unparticularized hunch[]" about the possibility of criminal activity based on the time and the location. Adams' Brief at 23. He cites to various cases from this Court and the Superior Court to support his position, but relies primarily on *Commonwealth v. DeWitt*, 608 A.2d 1030, 1032, 1033-34 (Pa. 1992), as controlling. Adams' Brief at 18-19.

In *DeWitt*, Pennsylvania State Troopers on a routine patrol observed a vehicle with its interior lights illuminated and exterior lights extinguished parked partially on the berm of the road and partially in a church parking lot just before midnight. Concerned that the car could be disabled, and further based on a request from the church to look for suspicious vehicles on its property, the troopers pulled alongside the vehicle to investigate. At the approach of the police vehicle, the interior lights of the vehicle extinguished, the persons inside made "furtive … and suspicious movements" and the vehicle began to pull away from the scene. *DeWitt*, 608 A.2d at 1032. The troopers became suspicious of criminal activity at that point and stopped the vehicle, then seeing

---

[9] In its reasonable suspicion analysis, the Commonwealth further contends that Officer Falconio observed keys laying on the rear passenger's side floor behind the seat as he walked up to the vehicle. As stated above, however, this contention is not supported by the record, as the trial court made a factual finding that the officer observed the keys at the time that he closed the door. *See supra*, note 2.

in plain view what they believed to be illegal drugs. After having the occupants exit the vehicle, the troopers searched the car and found drugs and drug paraphernalia.

The Commonwealth charged DeWitt with several violations of the Controlled Substance, Drug, Device and Cosmetic Act.[10] The trial court granted DeWitt's pretrial motion to suppress the evidence obtained during the search of the vehicle, finding that the police lacked reasonable suspicion of criminal activity to conduct the stop. The trial court found "that the only information available to the troopers was their observation of a vehicle parked in a church parking lot with its dome illuminated and its outside lights extinguished, and as the troopers approached, the vehicle attempted to leave the parking lot." *Id.*

The Superior Court reversed, finding, "The combination of furtive movements, time of night, previous notice from the property owner, potential parking violation, and attempted movement from the scene when the police arrived sufficiently justified the legality of the stop." *Id.* at 1034. This Court granted allowance of appeal and reinstated the trial court's suppression order. Of relevance to the case at bar, we concluded that the evidence of record was insufficient to justify an investigative detention and found the Superior Court's conclusion to be "unsupported by the record." *Id.* We stated, "Although the police had previous notice from the property owner of criminal behavior in the church parking lot [including underage drinking, "doing donuts" and "laying rubber"], there was absolutely no evidence that the vehicle in question engaged in the type of activities complained of," and that flight alone was insufficient to establish reasonable suspicion of criminal conduct. *Id.* at 1034 & n.2.

_____

[10] Act of April 14, 1972, P.L. 233, as amended, 35 P.S. 780-101 – 780-144.

We agree with Adams that the factual record in this matter bears a striking resemblance to that of *DeWitt*, with the facts of *DeWitt* providing an even greater indicia of criminal activity than was present here. Prior to the investigative detention, the only facts that Officer Falconio articulated were that a car was parked behind a closed business on public property at night. Officer Falconio did not observe Adams making any furtive or suspicious movements, nor had he received notice of criminal behavior occurring in that location, as the troopers had in *DeWitt*. Officer Falconio's testimony evinced only generalized concerns about the possibility of criminal activity occurring, based solely upon time and place, i.e., behind closed businesses at night. He provided no specific or articulable facts to support a belief that Adams was engaged or going to be engaging in criminal activity. Rather, in his testimony, he expressed more of a curiosity about what the driver was doing behind the closed businesses. *See* N.T., 8/25/2016, at 6, 9 (Officer Falconio testifying that he followed the vehicle behind the businesses because he wanted "to see what the occupant or occupants of the vehicle were doing," "to see why a car drove behind two dark, closed businesses at [three] o'clock in the morning," and to ensure that "there wasn't drug activity or an attempted burglary"). As in *DeWitt*, here Officer Falconio offered no testimony that he observed Adams commit any criminal offense or that Adams took any actions that might suggest that he was about to commit any criminal offense. Officer Falconio merely observed a man sitting in his car at night.

Both the Commonwealth and the courts below justify Officer Falconio's action based on the time of night and that Adams' vehicle was parked in an atypical location. As *DeWitt* makes clear, however, these factors alone do not give rise to a finding of

reasonable suspicion of criminal activity where the officer provided no specific or articulable facts to suggest that criminal activity is occurring or has occurred. *See DeWitt*, 608 A.2d at 1031-32.

We therefore conclude that Officer Falconio subjected Adams to an investigative detention unsupported by reasonable suspicion of criminal activity. The trial court erred by denying Adams' suppression motion on that basis and the Superior Court erred in its affirmance of that decision. As such, we reverse the decision of the Superior Court and remand the matter to the trial court for further proceedings consistent with this Opinion.

Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Mundy files a concurring and dissenting opinion in which Chief Justice Saylor joins.