J-A06008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEMETRIUS LEON WOODS-STUBBS | : | |
| | : | |
| Appellant | : | No. 1447 WDA 2022 |

Appeal from the Judgment of Sentence Entered November 8, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0000866-2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: June 11, 2024**

Demetrius Leon Woods-Stubbs appeals from the judgment of sentence, entered in the Court of Common Pleas of Allegheny County, following his convictions, after a nonjury trial, for one count each of firearms not to be carried without a license[1] and possession of a controlled substance.[2] In this appeal, Woods-Stubbs challenges the court's denial of his pre-trial motion to suppress evidence. After careful consideration, we affirm.

The facts of this case are as follows. On November 30, 2021, Officer Robert Pedley of the City of Pittsburgh Police, an officer with 15 years of training and experience, responded to a report of a female in bed not breathing. *See* N.T. Suppression Hearing, 6/16/22, at 5. Officer Pedley

_____

[1] 18 Pa.C.S.A. § 6106(a)(1).

[2] 35 P.S. § 780-113(a)(16).

arrived at the home and proceeded to the second-floor front bedroom, where he saw firefighters, emergency personnel, the unresponsive and soon-to-be-declared-deceased female, and Woods-Stubbs. *Id.* at 5-6.

Officer Pedley observed the emergency personnel attempting to resuscitate the unresponsive female and one of the personnel informed Officer Pedley that the unresponsive female was unlikely to survive. *Id.* at 6. Officer Pedley left the room and proceeded downstairs to call for backup until homicide detectives arrived. *Id.* at 7. Within minutes of returning downstairs, the unresponsive female was declared deceased due to an unknown cause. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 4:15. The decedent's suspicious death became the immediate subject of police investigation. *See* N.T. Suppression Hearing, 6/16/22, at 16.

After declaring her deceased, the emergency personnel began descending the stairs to exit the home, and Officer Pedley returned to the second-floor bedroom where the decedent's body remained. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 9:50. As he approached the room, Officer Pedley observed Woods-Stubbs at the foot of the bed with his body tucked behind a dresser making a stuffing motion with his hands in his waistband. *See* N.T. Suppression Hearing, 6/16/22, at 7. Woods-Stubbs was fully dressed and was wearing a coat. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 10:04-10:07. Once a few feet away, Officer Pedley requested identification and Woods-Stubbs told him that he did not have any. *Id.* at 10:08.

Upon being asked how he knew the decedent, Woods-Stubbs answered that he did not know her well. *Id.* at 10:16. Woods-Stubbs told officers that he had been at the house with the decedent for two days. *Id.* at 13:29. He explained that the last time he had seen her alive, the decedent answered the door and let him into the home that prior evening around midnight. *Id.* at 10:50. Woods-Stubbs also said that he and the decedent drank alcohol and smoked weed prior to Woods-Stubbs falling asleep around 2 a.m. in the bed he had shared with her. *Id.* at 11:40, 14:09. Further, Woods-Stubbs recounted that he awoke around 4 a.m. to use the bathroom and nudged the decedent, who was asleep at the time but moved a little. *Id.* at 12:11. Woods-Stubbs told Officer Pedley that, after using the bathroom, he fell back asleep and did not notice anything. *Id.* Woods-Stubbs stated that the decedent's mother woke him the next morning. *Id.* at 12:50.

Woods-Stubbs noted that he did not know the cause of the decedent's unresponsiveness or death. *Id.* at 13:46. Woods-Stubbs further told Officer Pedley that prior to staying with the decedent, he was staying with his sister, who lives nearby. *Id.* at 16:16. Woods-Stubbs also told Officer Pedley both that he had a criminal record and, at some point in the past, he had been shot in the spine, which affected his mobility. *Id.* at 14:52, 16:43.

After approximately eight minutes of interaction, Officer Pedley's training and experience led him to believe that Woods-Stubbs was concealing contraband or a weapon in his waistband, so he and Pittsburgh Police Officer

Miller[3] asked Woods-Stubbs to exit the bedroom and step into an adjacent bedroom where they further asked if Woods-Stubbs was armed. *See* N.T. Suppression Hearing, 6/16/22, at 8. After Woods-Stubbs responded that he was not armed, Officer Pedley conducted a pat-down search of Woods-Stubbs' person, and, upon reaching Woods-Stubbs' waistband, Officer Pedley felt what he knew to be the grip end of a handgun. *Id.* at 9. Officer Pedley removed the loaded handgun, made it safe, and Officer Miller placed Woods-Stubbs in handcuffs. *Id.* Thereafter, police further recovered marijuana, cocaine, and Clonazepam from Woods-Stubbs' person. *Id.* at 10.

On November 30, 2021—that same day—Woods-Stubbs was charged with various crimes relating to the incident. On January 27, 2022, those charges were amended, at which point, both above-mentioned offenses were held for trial.

On March 30, 2022, Woods-Stubbs filed a pre-trial motion to suppress the gun and drugs police discovered on his person because, he alleged, police did not have reasonable suspicion to conduct the stop or the frisk search, in violation of *Terry v. Ohio*, 392 U.S. 1 (1968). On June 16, 2022, the court conducted a suppression hearing and denied Woods-Stubbs' motion.

On June 21, 2022, the court held a nonjury trial. On August 9, 2022, after holding its verdict under advisement, the court convicted Woods-Stubbs of both above-mentioned charges. The court deferred sentencing for the

_____

[3] Officer Miller's first name does not appear in the certified record.

preparation of a pre-sentence investigation report. On November 8, 2022, the court sentenced Woods-Stubbs to an aggregate term of 9-18 months' incarceration followed by two years' probation.

On December 8, 2022, Woods-Stubbs filed a timely notice of appeal. Both Woods-Stubbs and the trial court have complied with Pa.R.A.P. 1925. On appeal, Woods-Stubbs raises the following issue for our review:

> Whether the trial court erred in denying [] Woods-Stubbs'[] motion to suppress the firearm and drugs that were found on his person where the police officers frisked him for officer safety but they did not have reasonable suspicion, based on specific and articulable facts, to believe that he was armed and dangerous?

Appellant's Brief, at 6.

Instantly, Woods-Stubbs argues that neither the law nor the facts of record support the trial court's conclusion that the police officers had reasonable suspicion to conduct the *Terry* search of his person. Specifically, Woods-Stubbs asserts that, contrary to the court's findings, he did not make any furtive movements, which, he alleges, Officer Pedley's body camera footage confirms. Woods-Stubbs claims that over the course of eight minutes of interaction, he did nothing suspicious, which he asserts Officer Pedley further confirmed through testimony. *See* Appellants Brief at 15-17, citing N.T. Suppression Hearing, 6/16/22, at 13 (Officer Pedley testifying that, upon approaching Woods-Stubbs, Woods-Stubbs' left hand was on top of bedroom dresser, but his right hand was behind dresser and not visible, Officer Pedley then interacted with Woods-Stubbs for eight minutes, asking questions about the incident, during which period of time he could see Woods-Stubbs' hands,

and Woods-Stubbs did not make any furtive movements, was cordial, polite, and respectful).

Woods-Stubbs cites to our decisions in **Commonwealth v. Reppert**, 814 A.2d 1196 (Pa. Super. 2002), and **Commonwealth v. Simmons**, 17 A.3d 399 (Pa. Super. 2011), for the proposition that "pre-stop furtive movements, by themselves, may not be used to justify an investigative detention and search where . . . the totality of the circumstances has established that the furtive movements did not raise immediate concern for the safety of the officer[.]" Appellant's Brief, at 18 (citation omitted).

Further, Woods-Stubbs asserts that Pennsylvania law requires police to articulate the danger posed under the specific circumstances of the case. **See** Appellant's Brief, at 21-22, citing **Commonwealth v. Hernandez**, 935 A.2d 1275 (Pa. 2007). Woods-Stubbs points out that, here, the officers did not testify to observing a bulge or the outline of the firearm and he alleges the officers failed to reasonably support their conclusion that Woods-Stubbs was armed and dangerous. In sum, Woods-Stubbs argues Officer Pedley lacked reasonable suspicion to conduct the search and thus the fruits of the search should be suppressed. We conclude that Woods-Stubbs is not entitled to relief.

The appellate standard of review for a challenge to the denial of a suppression motion is well-settled:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record

supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Livingstone*, 174 A.3d 609, 618-19 (Pa. 2017) (citation omitted). We may affirm the suppression court's decision if there is any basis in the record to support it, even if we rely on different grounds to reach the same result. *See Commonwealth v. Cartagena*, 63 A.3d 294, 301 (Pa. Super. 2013). In reviewing questions of law, the appellate standard of review is *de novo* and the scope plenary. *See Livingstone*, 174 A.3d at 619.

As a panel of this Court cogently explained, the United States and Pennsylvania constitutions protect citizens from unreasonable police searches and seizures:

> The Fourth Amendment to the United States Constitution,[4] made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution[,5] protect a

_____

[4] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV.

[5] The Pennsylvania Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no

*(Footnote Continued Next Page)*

person from unlawful searches and seizures. Our Supreme Court has long held that[,] although the Pennsylvania Constitution provides broader protection from unreasonable searches and seizures than the United States Constitution, the **Terry** doctrine, announced in the seminal case of **Terry**[, **supra**], sets forth the reasonableness standard for Article I, Section 8 of the Pennsylvania Constitution.

**Commonwealth v. Brame**, 239 A.3d 1119, 1127 (Pa. Super. 2020) (citation, footnote, quotation marks, and brackets omitted).

In **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), our Supreme Court explained the two categories of permissible warrantless seizures that police may effectuate and what protections are attendant to each type of seizure:

> We recognize only two types of lawful, warrantless seizures of the person, both of which require an appropriate showing of antecedent justification: first, an arrest based upon probable cause; second, a 'stop and frisk' based upon reasonable suspicion. Here, we are concerned with this latter type of seizure— interchangeably labeled an "investigative detention," a "**Terry** stop," or, when coupled with a brief pat-down search for weapons on the suspect's person, a "stop and frisk."

> To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from

---

warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. Art. I, § 8.

acting upon the fortuitous discovery of evidence suggesting a different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

*Id.* at 927-928 (citations, some quotation marks, and brackets omitted).

Also, importantly, a "mere encounter," a third recognized type of lawful warrantless police-citizen interaction, does not require any level of suspicion by police or any response by the citizen. *Commonwealth v. Young*, 162 A.3d 524, 529 (Pa. Super. 2017) (mere encounter between police officer and citizen does not need support of any level of suspicion and carries no official compulsion on part of citizen to stop or to respond to police). "A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond." *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super. 2000) (citation and quotation marks omitted). The mere fact that a citizen ordinarily feels obligated to respond to a police officer, without more, however, is not sufficient to make an interaction a seizure. *See Commonwealth v. Mathis*, 173 A.3d 699, 713 (Pa. 2017).

"A mere encounter may escalate into an investigatory detention or seizure if police action becomes too intrusive." *Young*, 162 A.3d at 529. *See also Commonwealth v. Strickler*, 757 A.2d 884, 889-90 (Pa. 2000) (court employs objective totality of circumstances test to determine whether seizure has taken place by inquiring whether reasonable person would believe he or

she is free to leave); ***Commonwealth v. Watkins***, 750 A.2d 308, 312-13 (Pa. Super. 2000) (police detention becomes custodial and requires probable cause when coercive to extent of functional arrest under totality of circumstances, considering:  basis for detention; length; location; whether suspect was transported against his or her will, how far, and why; whether restraints were used; whether law enforcement showed, threatened, or used force; and investigative methods employed to confirm or dispel suspicions).

"An officer may stop and briefly detain a person for investigatory purposes when that officer has reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot." ***Commonwealth v. Smith***, 172 A.3d 26, 33 (Pa. Super. 2017) (citation and quotation marks omitted).  "[T]he fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." ***Commonwealth v. Gray***, 784 A.2d 137, 142 (Pa. Super. 2001).  When making that determination, we must consider the totality of the circumstances, including such factors as "tips, the reliability of the informants, time, location, and suspicious activity, including flight." ***Id.***, citing ***Commonwealth v. Freeman***, 757 A.2d 903, 908 (Pa. 2000).  "[I]n determining whether the officer acted reasonably . . ., due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." ***Terry***, 392 U.S. at 27.

Our Supreme Court recently reiterated that, "[t]he purpose of a **Terry** frisk is to dispel any fear that the stopped suspect is armed and dangerous." **In re T.W.**, 261 A.3d 409, 421 (Pa. 2021). Such a frisk does not require the officer to be certain that the individual is armed. **See id**; **see also Minnesota v. Dickerson**, 508 U.S. 366, 372-73 (1993) (officer must have reasonable suspicion of criminal activity prior to conducting pat down search). To establish reasonable suspicion to conduct the frisk, "the police officer must articulate specific facts from which [the officer] could reasonably infer that the individual was armed and dangerous." **Commonwealth v. Bozeman**, 205 A.3d 1264, 1274 (Pa. Super. 2019) (citations omitted).

In determining whether a frisk was constitutionally valid and supported by reasonable suspicion, the suppression court examines "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." **Commonwealth v. Taylor**, 771 A.2d 1261, 1269 (Pa. 2001) (citation and quotation marks omitted). The court makes this safety determination based on the totality of the circumstances as viewed through the eyes of a trained police officer. **See Commonwealth v. Williams**, 980 A.2d 667, 671 (Pa. Super. 2009).

However, an investigatory detention may not be premised on officer safety—safety considerations are relevant only when the detention is based upon the police officer's reasonable suspicion or probable cause that the person being stopped is committing or has committed a criminal offense. **See Commonwealth v. Adams**, 205 A.3d 1195, 1204 (Pa. 2019). Without

reasonable suspicion or probable cause, police may not conduct an investigatory detention. *See id.*

Here, in deciding that the police search of Woods-Stubbs' person was justified and lawful, the suppression court made the following findings of fact and conclusions of law at the end of the suppression hearing:

> [T]he officer arrives on the scene, and [y]ou have a deceased person. You have a person who's in the room with the body [] making furtive movements, putting something in his waistband[. H]e's beside the dresser, kind of secreted behind. [Officer Pedley] said [that] whether it was [a weapon,] evidence[, or], drugs, he didn't know.[6 Officer Pedley] just knew that it could have been something that was being put in his waistband or in that area. [A]nd then [Officer Pedley] had the discussion with [Woods-Stubbs]. In that discussion[, Woods-Stubbs] very clearly tells [Officer Pedley] that he has a criminal record[. During their conversation, Officer Pedley and Woods-Stubbs talked] about the [decedent] and what Woods-Stubbs knows or doesn't know and some information about where [he] had come from, and he had walked from his sister's house[. After eight minutes of interaction, Officer Pedley] asked [Woods-Stubbs] to step into [an adjacent

_____

[6] Officer Pedley testified at the suppression hearing as follows:

> A: [] As I approached [] Woods-Stubbs, he was in the bedroom, at the foot of the bed, with his body tucked behind a dresser, making a stuffing motion with his hands in his waistband.
>
> Q: And that stuffing motion, given your training and experience, what is that usually indicative of?
>
> A: It would be consistent with somebody attempting to hide contraband in their waistband area.
>
> Q: Just contraband?
>
> A: Contraband or firearms.

N.T. Suppression Hearing, 6/16/22, at 7-8.

bed]room. While they're waiting for the homicide detectives, [Officer Pedley informed Woods-Stubbs of his intention to search Woods-Stubbs for weapons. Woods-Stubbs] doesn't object, [and Officer Pedley] pats him down[ and] finds the firearm. I think that under the totality of the circumstances, given these particular very strange circumstances, that there's a deceased person, that officers on scene have no knowledge of exactly how that person came to be deceased, they haven't ruled out anything[, thus, the officers had reasonable suspicion to search Woods-Stubbs].

N.T. Suppression Hearing, 6/16/22, at 33-35. The trial court further explained its reasoning for denying suppression in its Rule 1925(a) opinion:

In the instant case, [Woods-Stubbs] was in the room with a deceased female whose cause of death was unknown. While officers were awaiting the arrival of homicide detectives, [Woods-Stubbs] could be seen hiding his body behind a dresser while stuffing something into the waistband area of his pants[,] arousing the suspicion of Officer Pedley. [Woods-Stubbs'] behavior, combined with his statements[,] led [Officer] Pedley to believe that [Woods-Stubbs] was concealing a firearm or contraband and was engaged in criminal activity. [Officer Pedley] asked [Woods-Stubbs] to step [in]to an adjoining room to remove him from the bedroom where the [decedent's] body was located, and [Woods-Stubbs] denied having a weapon on his person. When Officer Pedley reached around [Woods-Stubbs'] waistband to pat him down, he immediately felt the butt of a firearm.

Trial Court Opinion, 5/18/23, at 5.

First, as a threshold issue, the parties appear to agree that Woods-Stubbs was subjected to an investigatory detention and search that must be supported by reasonable suspicion. Importantly, Woods-Stubbs does not argue that his seizure or search required more support than reasonable suspicion or that he was functionally arrested prior to Officer Pedley locating the gun. Further, the Commonwealth does not make any argument that Woods-Stubbs was not seized at the time of the search.

- 13 -

Nevertheless, the suppression court never specified the point at which Woods-Stubbs was specifically seized, and that question appears to remain open. However, the timing of the seizure must be determined because the *Terry* frisk may only be conducted incident to a valid investigatory detention. *See Adams*, 205 A.3d at 1204. Indeed, we have previously noted that the court is required to identify the moment a seizure occurs to properly frame its analysis on the constitutionality of the police conduct in question. *See Commonwealth v. Mackey*, 177 A.3d 221, 233 (Pa. Super. 2017).

The determination of when a seizure was effectuated is a question of law. *See Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (The issue of "whether a seizure occurred [] is a pure question of law subject to plenary review.") (citation and quotation marks omitted); *see also Young*, 162 A.3d at 529 ("Whether an interaction between a private individual and a police officer is a mere encounter or a seizure is a question of law.").

Although the trial court did not make a specific finding on when the stop occurred, and the parties have not developed argument on the issue, we conclude that the factual record—one that includes the notes of testimony from the suppression hearing and body camera video of nearly the entire interaction[7]—is sufficiently developed for us to decide this question of law.

---

[7] As discussed *infra*, at n.11, Officer Pedley testified that, although his body camera captured some of Woods-Stubbs' furtive movements, Officer Pedley was physically able to observe more of those movements in the moments just prior to the camera capturing the same. *See* N.T. Suppression Hearing, 6/16/22, at 14-15.

- 14 -

Based on our review of the record, we find that Officer Pedley and Woods-Stubbs had a mere encounter up to the moment of the frisk; Woods-Stubbs was only seized once Officer Pedley conducted the frisk in the room adjacent to the one where the interaction began.  This is because, as explained below, under the circumstances of this case, and pursuant to our Supreme Court's caselaw, we conclude that a reasonable person would have felt free to leave, **see Strickler**, **supra**, at any point during the interaction prior to the frisk.  **See Commonwealth v. Parker**, 161 A.3d 357, 363 (Pa. Super. 2017) (factors to be considered in making determination of whether reasonable person would feel free to leave include:  showing of authority or exercise of force; demeanor of police officer; tone and manner of expression; content of interrogatories or statements; number of police officers; whether there is physical contact or police direction of subject's movements; location and timing; whether officer informs citizen is suspected of criminal activity; and visible presence of weapons on officer).

Here, at the point of initial contact with Woods-Stubbs in the second-floor front bedroom, Officer Pedley calmly and non-confrontationally approached Woods-Stubbs, keeping several feet of distance between them. **See** Officer Robert Pedley Body Camera Video, 11/30/21, at 10:09.  Officer Pedley was the only police officer[8] to approach Woods-Stubbs at that time,

_____

[8] Although Officer Pedley was the only officer on scene initially, there was one other person in the room—a uniformed medical professional—who, after a few
*(Footnote Continued Next Page)*

- 15 -

and, although uniformed, he did not make any initial show of authority beyond asking if Woods-Stubbs' had identification.[9] *Id.* at 10:10. Woods-Stubbs responded that he did not. *Id.* at 10:11.

Officer Pedley then asked, conversationally, how Woods-Stubbs knew the decedent. *Id.* at 10:12. Woods-Stubbs politely replied and provided a narrative answer, which included that he did not know the decedent well, but had spent time with her recently and that he had slept in the house where the decedent was found that morning. *Id.* at 10:12-10:40. Upon hearing that Woods-Stubbs might have information important in the investigation of the decedent's cause of death, Officer Pedley began to take notes with a pen and paper. *Id.* at 10:41.

During the encounter, Officer Pedley never informed Woods-Stubbs that he was a suspect of any crime. Woods-Stubbs was polite, respectful, cordial, and cooperative throughout the entire interaction. *See* N.T. Suppression Hearing, 6/16/22, at 13. Further, Woods-Stubbs answered every question

_____

minutes, left the room in the middle of the interaction between Officer Pedley and Woods-Stubbs. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 17:18. Officer Miller arrived in uniform just prior to the point where the encounter moved from the front bedroom to the adjacent room and positioned himself in the hallway behind Officer Pedley. *See id.* at 17:57.

[9] During a mere encounter, police officers may ask for identification without escalating the interaction into an investigative detention. *Compare Commonwealth v. Au*, 42 A.3d 1002, 1009 (Pa. 2012) (arresting officer's request for identification did not transform encounter with Appellee into unconstitutional investigatory detention), *with Commonwealth v. Cost*, 224 A.3d 641, 651 (Pa. 2020) (police retention of identification is material and substantial escalating factor in totality assessment).

completely and often volunteered additional information that was not requested of him. Woods-Stubbs' unsolicited divulgences included both that Woods-Stubbs was previously arrested and that he had been shot on a prior occasion. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 14:52, 16:43.

Also, Officer Pedley did not search Woods-Stubbs' name or information in any database, either in response to Woods-Stubbs' failure to produce any valid identification or to Woods-Stubbs' revelations that he possessed a criminal record and had been shot on a prior occasion. *See Mathis*, 173 A.3d at 713 (no seizure effectuated, and interaction only mere encounter, where interaction between police and defendant was polite, police did not inform defendant he was suspected of criminal activity, and interaction was relaxed, non-confrontational, and conversational); *see also Lyles*, 97 A.3d at 306-07 (appellant subjected to mere encounter, and not investigative detention, where officer quickly jotted information instead of attempting to memorize it, did not use appellant's information to run background check, and took no additional steps to suggest detention or restrict appellant's freedom of movement).

Upon Officer Miller's arrival on scene, Officer Pedley informed Woods-Stubbs that the officers wanted to move him to the adjacent room to separate him from the decedent's body. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 18:01. At this point, the interaction still remained a mere encounter. *See Mathis*, 173 A.3d at 712-13 (police request to move into

- 17 -

another room of house did not elevate interaction to investigative detention from mere encounter).

Finally, immediately upon entering the adjacent room, Officer Pedley informed Woods-Stubbs' he was going to search his person for officer safety, prior to having Woods-Stubbs sit on the bed for a few minutes to await further questions. At that point, Officer Miller positioned himself to block the doorway from that room into the hallway—which doorway ultimately led to the stairs and the exit of the home—and Officer Pedley simultaneously frisked Woods-Stubbs' person. *See* Officer Robert Pedley Body Camera Video, 11/30/21, at 18:27. This was the point where police seized Woods-Stubbs, and reasonable suspicion was required to both support the stop and the frisk. *See Adams*, 205 A.3d at 1204 (officer physically closed defendant's vehicle door as defendant began to open it, signaling defendant not free to leave); *see also Mathis*, 173 A.3d at 713 (defendant seized once officer reached out and grabbed his jacket); *Commonwealth v. Lewis*, 636 A.2d 619, 621-23 (Pa. 1994) (seizure effectuated where four non-uniformed officers stood side-by-side, informed defendants they were investigating potential drug couriers, asked whether defendants would mind speaking with them, and followed as defendants backed away five to ten feet until backed up to wall); *Commonwealth v. Greber*, 385 A.2d 1313, 1316 (Pa. 1978) (detention by blocking defendants' automobile constituted seizure); *In the Interest of C.C.*, 780 A.2d 696, 700 (Pa. Super. 2001) (seizure effectuated once defendant frisked).

Since we have concluded Woods-Stubbs was seized,[10] we must determine if it was supported by reasonable suspicion. Here, we find it was because Officer Pedley found Woods-Stubbs, who was likely one of the last individuals to see the decedent alive, located in the room with the non-responsive decedent. The decedent's cause of unresponsiveness (and subsequent death) was unknown and suspicious, and the subject of active police investigation. While Officer Pedley awaited the arrival of homicide detectives, he observed Woods-Stubbs hiding his body behind a dresser and stuffing something into the waistband area of his pants,[11] which Officer Pedley testified he believed could have been a weapon or contraband. **See Smith**, 172 A.3d at 33 (officer may stop and briefly detain person for investigatory purposes when officer has reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot). Under these facts, we

---

[10] As discussed above, neither the trial court nor the parties specify at what point Woods-Stubbs was seized. We conclude that Woods-Stubbs' seizure occurred at the moment he was frisked.

[11] Woods-Stubbs claims that the trial court's finding that he made furtive movements or a stuffing motion in his waistband is unsupported by the record. We disagree. First, our review of Officer Pedley's body camera video clearly shows the stuffing motion described at the suppression hearing. **See** Officer Robert Pedley Body Camera Video, 11/30/21, at 10:04 – 10:07. Second, the suppression court found Officer Pedley credible when he testified to observing Woods-Stubbs' furtive movements prior to those same movements being captured by his body camera. **See** N.T. Suppression Hearing, 6/16/22, at 15-16 (Officer Pedley explaining that due to its position on his chest, his body camera did not capture everything that he was able to observe first-hand as he turned his head to look over the stairwell wall upon approaching Woods-Stubbs); **see also supra** at n.7.

conclude that it was reasonable for Officer Pedley to believe Woods-Stubbs might have secreted evidence related to the decedent's death in his waistband, thus giving rise to reasonable suspicion to effectuate a stop.

Regarding Officer Pedley's search of Woods-Stubbs' person, in addition to relying on the above particular facts, in answering Officer Pedley's questions, Woods-Stubbs admitted that he smoked marijuana with the decedent on the night prior, noted that he had an existing criminal record, stated that he had been shot on a prior occasion, explained he had been with the decedent for the past two days, stated that he was possibly the last person to have seen the decedent alive overnight, and noted that he was not sure as to the decedent's cause of death.[12] *See In re T.W.*, 261 A.3d at 421 (police officer may frisk suspect based upon reasonable suspicion that suspect is armed and dangerous). We conclude, therefore, that it was reasonable for Officer Pedley to frisk Woods-Stubbs, incident to investigating Woods-Stubbs' potential connection to the decedent's suspicious death, where Officer Pedley testified that he observed Woods-Stubbs potentially hiding a weapon in his waistband. *See Terry*, *supra* at 27; *see also Commonwealth v.*

---

[12] Indeed, it was the combination of Woods-Stubbs' actions, his location, and his answers to Officer Pedley's questions that raised a reasonable suspicion that criminal activity was afoot and that Woods-Stubbs was armed and dangerous. Based on the record and the totality of these circumstances, we disagree with Woods-Stubbs' assertion that the search of his person was based solely on furtive movements, his location, or a combination of only those two factors. *See* Appellant's Brief, at 18, citing *Reppert*, *supra*; *see also id.* at 15, citing *Commonwealth v. Grahame*, 7 A.3d 810, 816 (Pa. 2010).

*Cunningham*, 287 A.3d 1, 11 (Pa. Super. 2022) (officer may pat-down individual whose suspicious behavior officer is investigating on basis of reasonable belief individual is presently armed and dangerous, which must be based on specific articulated facts from which officer reasonably inferred individual was armed and dangerous).

Also, we find *Hernandez*, *supra*, inapposite because Officer Pedley, in fact, clearly articulated the danger posed under the specific circumstances of this case. Indeed, Officer Pedley testified that he observed Woods-Stubbs making a stuffing motion into his waistband while secreted behind the dresser, actions that Officer Pedley believed may have been Woods-Stubbs hiding a weapon in his waistband. *See* N.T. Suppression Hearing, 6/16/22, at 7-8; *see supra* at n.6.

In sum, we conclude that, in light of his training and experience, and under the totality of the circumstances, Officer Pedley articulated sufficient facts to establish reasonable suspicion both to conduct an investigative detention of Woods-Stubbs, and to search Woods-Stubbs' person for weapons.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/11/2024