J-A01002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| OMAR PRIOLEAU | : | No. 1031 EDA 2022 |

Appeal from the Order Entered March 28, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003171-2020

BEFORE: LAZARUS, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED MAY 31, 2023**

The Commonwealth appeals from the order entered in the Philadelphia County Court of Common Pleas suppressing the physical evidence recovered after a traffic stop of Omar Prioleau's (Appellee's) car. The Commonwealth argues the trial court erred by finding the officers did not have reasonable suspicion or probable cause to stop Appellee's vehicle based on violations of the Philadelphia Parking Code[1] (the Code). After careful consideration, we reverse the trial court's suppression order and remand for further proceedings.

---

[1] Phila. Code, §§ 12-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; https://codelibrary.amlegal.com/ codes/philadelphia/latest/philadelphia_pa/0-0-0-266407.

On January 11, 2020, around 9:49 p.m., Philadelphia Police Officers Michael Sidebotham[2] and Ryan Del Ricci initiated a traffic stop after observing a vehicle they believed to be illegally parked in a bus zone with the engine running. N.T., 2/4/22, at 15-16, 31. Officer Sidebotham noted the vehicle and the driver — Appellee — matched descriptions of a perpetrator and getaway car from a December 16, 2019, homicide investigation. *Id.* at 17, 19. The officers arrested Appellee and confiscated his clothing — allegedly the same worn during the murder — a ski mask, and marijuana. *Id.* at 7, 19-20, 24. He was subsequently charged with, *inter alia*, first-degree murder[3] in relation to the December 2019 homicide.

On August 18, 2021, Appellee filed a motion to suppress all physical evidence recovered from the traffic stop, arguing the officers did not have reasonable suspicion or probable cause to stop the vehicle, and consequently, any evidence from the subsequent warrantless search was illegally obtained. *See* Appellee's Motion to Suppress the Physical Evidence, 8/18/21, at 2 (unpaginated). On February 4, 2022, the court held a suppression hearing, where the Commonwealth presented the testimony of Officer Sidebotham, as summarized below.

---

[2] The notes of testimony spell Officer Sidebotham's name "Sitdeotham." However, the certified record spells his name "Sidebotham." Thus, we use this spelling.

[3] 18 Pa.C.S. § 2502(a).

Officer Sidebotham testified that on December 16, 2019, a homicide occurred in the area of 67th Avenue and North Broad Street in Philadelphia. N.T. at 7. Two days after the murder, Philadelphia Homicide Detective Cutler[4] contacted Officer Sidebotham so he could review surveillance footage of the crime. *Id.* The video showed the perpetrator — who had a tattoo on his hand, and was wearing "black tattered jeans," a black cardigan, and "green military-colored shoes with distinct black soles"[5] — shooting the victim and fleeing the scene. *See id.* at 7-9, 19-20. Officer Sidebotham also reviewed "stills" of the getaway car — a 2008 gray Infiniti G35x, with "silver or gray" rims and a Pennsylvania tag LBM-2931. *Id.* at 9-11, 17. On January 7, 2020, Detective Cutler contacted Officer Sidebotham to inform him the getaway car from the December 16, 2019, homicide was parked two blocks away from the crime scene. *Id.* at 11.

A few days later, on January 11th, Officers Sidebotham and Del Ricci, were on patrol in the area of 68th Avenue and North Broad Street. N.T. at 6, 13. Near 6802 North Broad Street, Officer Sidebotham saw a car parked on top of a white "X" box on the street "in front of a bus lane stop[.]" *Id.* at 15-16. The bus zone was marked by a sign, which stated "no parking" with an arrow pointing to the left. *Id.* at 32-33. The vehicle was parked to the right

---

[4] Detective Cutler's first name does not appear in the record.

[5] From the testimony elicited at the suppression hearing, it appears the homicide suspect was also wearing a ski mask in the surveillance footage. *See* N.T. at 29-30.

of the sign. *Id.* at 33. The officers pulled behind the car, activated their lights, and initiated a traffic stop. *Id.* at 31-32.

Officer Sidebotham acknowledged no buses passed while he observed the vehicle parked in that location and did not state how long the car was idle before he initiated the traffic stop. N.T. at 33. However, he did note that he did not "sit on it for a while" before activating his lights. *See id.* In his report, the officer stated he stopped the vehicle because the "engine [was] running in a bus zone, sign posted also with a large X on the pavement marking no car zone." *Id.* at 31. However, at the hearing, Officer Sidebotham testified he noticed the car because "[i]t matched the description of the stills [of the getaway vehicle from the December 2019 homicide] and it had the same style rims, either silver or gray." *Id.* at 17. Though the vehicle had the same license plate as the getaway car, he did not recall if he noticed this before or after activating his lights. *Id.* at 36. Officer Sidebotham admitted at the hearing that he had "[n]o idea" how a 2008 Infiniti G35x would differ from the same model manufactured in another year. *Id.* at 35.

Officer Sidebotham approached the vehicle, and when the occupants rolled down the windows, he smelled marijuana coming from the inside. N.T. at 29. There were three occupants in the vehicle. *See id.* at 22. Appellee was in the driver's seat "wearing black tattered jeans[ in] the same style" as the perpetrator from the December 2019 murder. *Id.* at 19. Officer Sidebotham testified that because the vehicle matched the description of the getaway car, and Appellee matched the description of the December 2019

homicide suspect, he asked all of the occupants to exit the vehicle. *Id.* at 22. Once Appellee was out of the car, Officer Sidebotham noticed that he was wearing "the same" black cardigan and "very distinct sneakers" as the perpetrator in the surveillance video. *Id.* at 20. The officer also saw that Appellee, like the perpetrator in the video, had a tattoo on his hand, but it is unclear from the testimony when he saw the tattoo. *See id.* at 19-20 (testifying he asked Appellee to exit the car after seeing his jeans and "once [Appellee] exit[ed] the vehicle[,]" he noticed, *inter alia*, the tattoo), 21-22 (stating that when he "initially approached the vehicle[,]" the officer saw Appellee's hands).

After Appellee and the other two passengers[6] exited the vehicle, the officers placed Appellee in handcuffs and contacted Detective Cutler. N.T. at 23-24. Officer Sidebotham "held the scene for a search warrant[,]" but before commencing a search, he saw "a ski mask[7] . . . and some marijuana in the back seat" of the car. *Id.* at 24. Officer Sidebotham then searched[8] the

---

[6] One of the car's passengers, Brandon McKelvy, was arrested for an outstanding warrant unrelated to the present appeal or the 2019 homicide. *See* N.T. at 23. The remaining passenger, Dante Carter, was free to leave the scene. *Id.*

[7] Officer Sidebotham clarified the ski mask recovered from the vehicle search "didn't match the type of ski mask that the shooter was wearing" during the 2019 homicide. N.T. at 29-30.

[8] It is not apparent from Officer Sidebotham's testimony if he secured a search warrant before entering the vehicle.

interior and trunk of the vehicle, but did not recover any further evidence.[9] *Id.* at 25-26. Officers Sidebotham and Del Ricci transported Appellee to the police station where they collected his clothing and shoes as evidence related to the 2019 homicide. *Id.* at 26-27.

After the hearing, the trial court entered an order granting Appellee's motion to suppress the physical evidence obtained from the vehicle search. Order, 3/28/22.[10] The Commonwealth timely filed an appeal[11] and certified that the court's suppression order "terminate[d] or substantially handicap[ped]" its prosecution of the case. *See* Commonwealth's Notice of Appeal, 4/11/22; Pa.R.A.P. 311(d).

The Commonwealth raises one issue on appeal:

> Did the [trial] court err in suppressing physical evidence, particularly clothing worn by [Appellee,] which supported the inference that he was the perpetrator of a homicide, where the evidence was discovered by the police when they lawfully stopped the vehicle he was driving?

Commonwealth's Brief at 4.

_____

[9] Additional officers arrived at some point during the search. *See* N.T. at 26. One of them transported McKelvy to police headquarters. *Id.*

[10] The trial court subsequently issued "Findings of Fact and Conclusions of Law" pertaining to this matter on June 21, 2022. *See* Findings of Fact and Conclusions of Law, 6/21/22.

[11] On May 2, 2022, the Commonwealth complied with the trial court's order and filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). As noted above, the trial court filed its Findings of Fact and Conclusions of Law on June 21st, followed by a Pa.R.A.P. 1925(a) opinion on June 24th. *See* Trial Ct. Op., 6/24/22.

When reviewing a challenge to a suppression order, we apply the following standard of review:

> [A]n appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Tillery*, 249 A.3d 278, 280 (Pa. Super. 2021) (citations omitted).

There are three categories of interactions police can have with civilians:

> The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with any requests made or, conversely, to ignore the officer and continue on his or her way.

> The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot.

> The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. . . .

- 7 -

***Commonwealth v. Adams***, 205 A.3d 1195, 1199-1200 (Pa. 2019) (citations omitted & paragraph breaks added), *cert denied*, 140 S.Ct. 2703 (U.S. 2020).

Regarding traffic stops, this Court has stated the following:

A police officer has the authority to stop a vehicle when he or she has reasonable suspicion that a violation of the vehicle code has taken place, for the purpose of obtaining necessary information to enforce the provisions of the [Motor Vehicle C]ode. 75 Pa.C.S.A. § 6308(b). However, if the violation is such that it requires no additional investigation, the officer must have probable cause to initiate the stop.

Put another way, if the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop — if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion.

\* \* \*

The police have probable cause where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. We evaluate probable cause by considering all relevant facts under a totality of circumstances analysis.

***Commonwealth v. Spence***, 290 A.3d 301, 312 (Pa. Super. 2023) (emphasis & some citations omitted).

Returning to the Commonwealth's argument, it avers the court erred when it suppressed the physical evidence recovered after the traffic stop. Commonwealth's Brief at 13. It insists that even though Appellee's car was parked behind the "no parking" sign, thus complying with its directive, the car was still in violation of traffic regulations. ***Id.*** at 16-17. The Commonwealth

contends that Appellee was stopped in a box with a large white "X" painted on the street, which also signals a no parking zone. *Id.* at 17-18. The Commonwealth maintains that the trial court erroneously relied on ***Coard v. City of Philadelphia***, 2018 WL 844818 (Pa. Cmwlth. 2018), a non-precedential Commonwealth Court opinion,[12] when it stated that "posted signs designat[e] where parking is prohibited[,] not any markings on the pavement." *Id.* at 20, *citing* Trial Ct. Op., at 7. It argues that ***Coard*** "does not support the conclusion that roadway markings need not be followed" as the trial court suggests. Commonwealth's Brief at 20.

Moreover, the Commonwealth maintains that even if Appellee was parked legally, the totality of the circumstances supported the traffic stop. Commonwealth's Brief at 23. It avers that the officers saw a car stopped "within a 'box' . . . that had a large white X[;]" thus they had a "legitimate belief" that the car was stopped illegally. *Id.* at 23-24. The Commonwealth contends that this observation, combined with the officers recognizing the vehicle as the getaway car from a recent homicide, justified initiating further investigation. *Id.*

---

[12] Decisions of the Commonwealth Court are not binding upon this Court, but may serve as persuasive authority. ***See*** Pa.R.A.P. 126(b)(1)-(2) (unreported memorandum opinions of the Commonwealth Court filed after January 15, 2008, may be cited as persuasive authority); ***Commonwealth v. Bowers***, 185 A.3d 358, 362 n.4 (Pa. Super. 2018) (Commonwealth Court decisions are not binding on this Court but may be used as persuasive authority).

In response, Appellee argues that while pavement markings are "legitimate means of communicating certain vehicular conduct," here they are "irrelevant." Appellee's Brief at 22-23. Appellee contends that traffic control devices "ha[ve] a specific purpose[,]" which is to guide traffic, not "demarcate a fixed use area." *Id.* at 23-24. He maintains that to honor the pavement markings in this matter would render Section 12-913(1)(a)(.9) of the Philadelphia Parking Code superfluous. *See id.* at 24. Further, he insists that under "the plain language of [the Code], the white 'X' on the pavement did not legally create a no-parking zone." *Id.* at 25.

In the alternative, Appellee avers that even if he was parked in a bus zone, under Section 12-909 of the Code, he may "temporarily stop . . . for the purpose of and while actually engaged in the loading or unloading of passengers[.]" Appellee's Brief at 26, *citing* Phila. Code. § 12-909. He maintains that there was no testimony at the suppression hearing that he was parked in the bus zone for a significant amount of time or that he was **not** loading or unloading passengers. *Id.* at 27.

Pertinent to the issue on appeal, we note that generally, the Motor Vehicle Code is the controlling law for traffic violations. However, when both the Motor Vehicle Code and local ordinances provide for the same conduct and the offense is rooted in a parking violation — not a moving violation — we apply local ordinances. *See* 75 Pa.C.S. § 6301 ("Except for parking violations, when the same conduct is proscribed under [the Motor Vehicle Code] and a local ordinance, the charge shall be brought under this title and not under the

local ordinance. . . .").  As the underlying traffic stop stems from a parking violation, we apply Philadelphia's local parking code to our analysis.

Relevant herein, the Code dictates:

Except when necessary to avoid conflict with other traffic or to protect the safety of any person or vehicle or in compliance with law or the directions of a police officer or official traffic-control device, no person shall [s]top, stand or park a vehicle . . . [a]t any place where official signs prohibit stopping.

Phila. Code § 12-913(1)(a)(.9).  "Official traffic control device[s]" include:

All signs, signals, markings and devices placed or erected by state or city officials having jurisdiction for the purpose of regulating, warning, or guiding traffic, in accordance with the provisions of The Vehicle Code.

Phila. Code § 12-102(11).  "No operator shall violate the instructions of any official traffic-control device[.]"  Phila. Code § 12-1202(1).

Further, generally, "[w]hen signs are erected giving notice thereof, no operator shall stop, stand or park a vehicle in . . . a designated bus stop[.]"  Phila. Code § 12-901(1)(b).  The Code defines a bus stop as "[a] fixed area in the roadway parallel and adjacent to the curb set aside for the expeditious loading and unloading of passengers only."  Phila. Code § 12-102(4).  The Code also provides for the following exception to this rule:

No person shall stop, stand, or park a vehicle other than a bus in a bus stop or bus stand . . . except that the operator of a passenger vehicle may temporarily stop therein for the purpose of and while actually engaged in loading or unloading passengers when such stopping does not interfere with any bus . . . about to enter such stand.

Phila. Code § 12-909(1).

We note that the trial court did not make any findings pertaining to the search of Appellee's vehicle after the stop or his subsequent arrest in either its June 21st Findings of Fact or June 24th opinion. *See* Findings of Fact and Conclusions of Law, at 1-3; Trial Ct. Op., at 1-7. Rather, the court's decision to grant Appellee's suppression motion was based solely on the purported illegality of the initial traffic stop. The trial court opined:

> In the instant case the only specific, articulable fact that Officer Sidebotham possessed was that the vehicle they were stopping, was stopped with the engine running, behind a sign that prohibited parking in front of the sign. Philadelphia Code § 12-901(1)(b) prohibits parking in a designated bus zone, which is the provision that was relied on in this case as the justification for this vehicle stop.
>
> However, it is the posted signs designating where parking is prohibited that is controlling, not any markings on the pavement. *Coard*[, 2018 WL 844818]. Here, the vehicle was stopped within the large "X" marking on the road, but it was behind the area that the sign designated as the no parking zone. The officer could not come up with any specific articulable facts for stopping the car — he did not remember when he saw the license plate, and he was not able to see inside the vehicle until after he was approaching the car and the occupants rolled down the windows. [Appellee] did not attempt to flee, was not looking around furtively, nor was he the subject of a radio call or complaint.
>
> There was absolutely no interaction between the police officers and [Appellee]. There was a complete lack of specific, articulable facts which would warrant a man of reasonable caution in the belief that criminality was afoot and that the action of stopping the idling vehicle, parked behind the signed prohibited area was the appropriate action to be taken.

Trial Ct. Op., at 6-7 (paragraph breaks added). We disagree with the trial court's conclusions.

- 12 -

First, we note that the trial court's reliance on *Coard* is misplaced. In *Coard*, the defendant received a parking ticket for parking in a bus zone. *Coard*, 2018 WL 844818, at *1. He challenged the ticket, arguing that while the bus zone was denoted by a sign, it was not designated by pavement markings, as required by the Code.[13] *Id.* The Bureau of Administrative Adjudication[14] (BAA) affirmed his citation and he appealed to the Parking Appeals Panel. *Id.* The defendant argued that even though there was a sign posted, his car was parked "between the sign and a big 'X' in a box . . . on the pavement[,]" which designated the no parking zone. *Id.* The Appeals Panel affirmed the citation, stating "[t]he regulation is established by the postage signage and not the marking on the ground." *Id.* (quotation marks & emphasis omitted). He then appealed to the trial court, which reversed the BAA's decision, noting that no parking zones are

> presumed to be marked with painted lines on the roadway[ and a]lthough signs may also be erected under [the Code] they do not alter the Streets Department's demarcation of designated areas. Thus, [the trial court] held the BAA erred in finding a violation when [the defendant's] vehicle was not parked in an area designated by pavement markings.

*Id.* at *2 (quotation marks & record citation omitted).

---

[13] The Philadelphia Parking Code was the governing local ordinance for the area in which the defendant received a parking ticket.

[14] The BAA is responsible for the resolution of parking ticket disputes in the City of Philadelphia. *See* https://www.phila.gov/departments/bureau-of-administrative-adjudication/.

The City of Philadelphia appealed the decision to the Commonwealth Court, arguing the Code does not require pavement markings to denote a bus zone, but only signage. *Coard*, 2018 WL 844818, *2. The Commonwealth Court concluded the no parking sign gave the defendant notice that parking his vehicle in front of the sign was prohibited. *Id.* at *5. It noted that the trial court's interpretation of the Code "disregarded the purpose of signage" which "prohibited parking **where he parked**." *Id.* (emphasis in original). Further, it stated:

> We are unpersuaded by [the defendant's] argument, which the trial court adopted, that designation must be shown by painted lines on the pavement. There is simply no basis for that requirement in the Code. In reaching its conclusion, the trial court ignored the plain language of Section 12-901 that imposed prohibitions "when signs are erected."

*Id.* (record citation omitted); *see also* Phila. Code § 12-901(1)(b) ("When signs are erected giving notice thereof, no operator shall stop, stand or park a vehicle in . . . a designated bus stop[.]). We conclude *Coard* is distinguishable from the present facts.

In *Coard*, the Commonwealth Court determined the defendant committed a parking violation when he parked in front of a sign, which unequivocally stated, "no parking" and "bus zone." The Commonwealth Court rejected the argument that pavement markings, not signs, designated no parking zones. However, the Court did **not** suggest that one should ignore pavement markings all together and only comply with the directives of signage. Instead, it based its decision on the fact that the posted signage

- 14 -

"prohibited parking where he parked." ***Coard***, 2018 WL 844818, at *5 (emphasis omitted). Insinuating that this reasoning then lends itself to the conclusion that individuals may entirely ignore pavement markings is not supported by the Commonwealth Court's analysis. Moreover, even if we accepted the trial court's interpretation of ***Coard***, the opinion is non-precedential. Thus, it can only be cited as persuasive authority, and we would decline to apply that rationale to the present facts.

Returning to the present matter, we conclude that under the Code, Appellee was parked illegally. Though Appellee was parked behind a sign which dictated a no parking zone in front of it, his vehicle was on top of a traffic control device marker — a large white "X" — communicating that no parking was allowed in that space. ***See*** Phila. Code § 12-1202(1) ("No operator shall violate the instructions of any official traffic-control device[.]"); Phila. Code § 12-102(11) (traffic control devices include markings erected by state or city officials). As such, the traffic stop was supported by probable cause. ***See Spence***, 290 A.3d at 312 (probable cause exists where police have a reasonable belief that a criminal offense has been committed). The parties seem to imply that whether Appellee committed a violation heavily relies on whether he was stopped in a bus zone. However, regardless of the borders of the bus zone, Appellee was violating a local traffic ordinance. The traffic control device at issue — a large white "X" painted next to a curb — communicates to drivers that parking in that area was prohibited.

We reject Appellee's argument that pavement markings are "irrelevant" and would render signs superfluous. *See* Appellee's Brief at 22-24. In fact, to adopt his interpretation would result in a traffic control device — markings — becoming superfluous. We decline to conclude that only one of these mechanisms need be obeyed in this instance.

Appellee also argues that Section 12-909 of the Code provides an applicable exception. *See* Appellee's Brief at 26. We disagree. This Section allows for a vehicle to temporarily stop in a bus zone while "actually engaged in loading or unloading passengers[.]" *See* Phila. Code § 12-909. Appellee is correct that there was no testimony that he was parked for a significant amount of time. However, there was also no evidence presented suggesting that he was "actually engaged in" the conduct which lends itself to the exception. The officer did not observe another individual approaching or leaving the vehicle before initiating the stop.

Moreover, even if Appellee parked in a legal parking space, the totality of the circumstances supported a valid traffic stop. Officer Sidebotham testified that he was participating in an ongoing homicide investigation. *See* N.T. at 7. About one month after the crime, he observed a vehicle matching the description of the perpetrator's getaway car parked about one block away from the scene of the murder. *See id.* at 13, 15, 17. Specifically, the officer recounted that he recognized the vehicle from the "stills of the getaway car" he saw during the investigation and it "had the same style rims, either silver

- 16 -

or gray."[15]  **See id.** at 9-10, 17.  The matching vehicle description coupled with its proximity to the homicide supported the officers' decision to initiate further investigation.

Thus, on the narrow issue of whether the traffic stop was valid, we disagree with the trial court's determination.  Appellee may not ignore a traffic control device in favor of other mandates absent direction from police.  **See** Phila. Code § 12-1202 (vehicles may violate a traffic control device when "directed by . . . police[ ]"); **see also** Trial Ct. Op., at 7.  Further, we conclude the officers had probable cause to initiate a traffic stop when Appellee's vehicle was parked in violation of the Code and the totality of the circumstances demonstrated that the vehicle was potentially connected to an ongoing murder investigation.  As the issue before us concerns only the validity of the initial traffic stop, we express no opinion as to the legitimacy of the subsequent search.

Order reversed.  Case remanded for further proceedings.  Jurisdiction relinquished.

---

[15] The vehicle's license plate also matched the plate of the getaway car. However, we reiterate that Officer Sidebotham was unsure of whether he recognized this before or after he initiated the traffic stop.  **See** N.T. at 36.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/31/2023</u>