J-S34044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　　　:　　　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　v.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
ROBERT LEE SUTTON, JR.　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Appellant　　　　　　　　:　　No. 1463 WDA 2022

Appeal from the Judgment of Sentence Entered July 7, 2022
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s):  CP-37-CR-0000599-2019

BEFORE:  LAZARUS, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:　　　　　　**FILED: October 10, 2023**

Robert Lee Sutton, Jr. (Appellant), appeals the judgment of sentence imposed following his jury conviction of possession of a firearm prohibited.[1] We affirm.

Relevant to this appeal, the suppression court described the events leading to Appellant's arrest:

> On June 26, 2019, Officer Justin Warren of the New Castle Police Department was on patrol in a marked cruiser when he was dispatched to Double D's Café [(Double D's or the bar)] located at 426 East Washington Street, New Castle, … Pennsylvania, based upon reports [of] a male discharging an assault rifle.  Upon his arrival at the scene, Officer Warren observed people standing outside and he was informed the shooter went toward the rear of the building.  He then spoke with Daniel Bruno, the owner of Double D's [], who brought the officer behind a nearby garage where four .223 [caliber] shell casings were discovered.  Mr.

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

Bruno described the shooter as a black male wearing a black shirt with blue jeans. Officer Warren subsequently spoke with an employee of Double D's [], Tonya Gravatt, who informed him there was a surveillance video. She also indicated [that shortly before the shooting,] an individual she knew as "D" was engaged in an argument with another male who exited a white van. The surveillance video depicted a white van arriving at the scene at 1:00 a.m., [sic] a male removed his shirt and started a physical altercation. That male then entered the van and another male wearing a black shirt with blue jeans exited the van with a rifle and proceeded to the rear of the building beyond the view of the surveillance camera.

Officer Warren obtained a photograph of the white van showing a dent between the passenger door and the passenger side front fender from the surveillance video and disseminated [it] to local police officers through a "Be On the Look Out" (hereinafter "BOLO") warning.

Suppression Court Opinion, 12/2/19, at 2.

New Castle Police Detective Brandon Hallowich learned of the shooting when he arrived at work at 8:00 a.m. *Id.* at 2-3. He later learned from Officer Austin Pagley that the van related to the BOLO warning had been located parked on Dushane Street in New Castle. *Id.* at 3. Detective Hallowich set up surveillance of the van, which was parked in front the residence at 1008 Dushane Street. *Id.*

The police officers observed several individuals enter the white van and a felony vehicle stop was performed in order to detain all of the occupants therein. The individuals were ordered to exit the vehicle and were placed in handcuffs. [Appellant] and Bryant Binns were placed in separate police vehicles[,] while Gerald Greenham was seated next to a nearby wall due to health concerns. Detective Hallowich then spoke with Mr. Binns. Mr. Binns revealed [Appellant] was the shooter at Double D's [] and [Mr. Binns] was informed by Eileen Bower that [Appellant] returned to the residence with the firearm. [Mr. Binns] also indicated the firearm was still located in the residence.

- 2 -

The police officers secured the residence for officer safety based upon information there was possibly a firearm present[,] as it was used to fire the shots at Double D's [] and Officer Lewis believed he heard someone moving inside. The police officers knocked on the door to gain access to the residence and there was no response, so they obtained access by removing a screen from a window to avoid knocking down the door. It was later discovered there were no individuals present within the residence. The police officers then obtained a warrant to search the residence and they seized a DPMS AR15 style rifle with a 30[-]round magazine containing 20 live rounds in the living room. The serial number on the DPMS rifle was searched … and no record for ownership was found.

At approximately 5:00 p.m., [Police Corporal Fred Buswell] provided [Appellant] with **Miranda**[2] warnings [and] conducted an interview, which was recorded. [Appellant] stated he was sitting in the van during the altercation. He then grabbed the rifle and exited the van. [Appellant] explained he walked to the rear of the building and fired the rifle to stop the altercation.

Suppression Court Opinion, 12/2/19, at 3-4 (footnote added).

The Commonwealth charged Appellant with three counts of recklessly endangering another person,[3] and one count each of possession of firearm prohibited, and firearms discharge prohibited.[4] On August 30, 2019, Appellant filed a suppression motion claiming officers lacked reasonable suspicion to stop the white van. Suppression Court Opinion, 12/2/19, at 4. The trial court denied Appellant's suppression motion on December 2, 2019.

_____

[2] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

[3] 18 Pa.C.S.A. § 2705.

[4] New Castle Ord. § 725(2)(a).

- 3 -

Following the March 21-23, 2022, trial, a jury convicted Appellant of possession of a firearm prohibited, a first-degree felony. On July 7, 2022, the trial court sentenced Appellant to 6-12 years in prison. Appellant filed a post-sentence motion on July 18, 2022.[5] On October 6, 2022, the trial court held a hearing on Appellant's post-sentence motion. On December 2, 2022, the trial court denied Appellant's post-sentence motion. Appellant filed a notice of appeal on December 16, 2022. Appellant and the trial court complied with Pa.R.A.P. 1925.

Before addressing Appellant's substantive issues, we must first ascertain whether Appellant timely filed his notice of appeal.[6] Appellant filed his post-sentence motion on July 18, 2022. Pennsylvania Rule of Criminal Procedure 720 provides in relevant part, "If the judge fails to decide the motion within 120 days, or to grant an extension as provided in paragraph (B)(3)(b), the motion shall be deemed denied by operation of law." Pa.R.Crim.P. 720(B)(3)(a). There is no indication on the trial court's docket that Appellant requested or was granted an extension. Consequently, Appellant's post-

---

[5] In an order dated July 19, 2022, but filed on August 10, 2022, the trial court scheduled a post-sentence motion hearing for October 6, 2022. Trial Court Order, 8/10/22. Our review discloses Appellant's post-sentence motion was docketed a second time on August 10, 2022.

[6] "Jurisdiction is vested in the Superior Court upon the filing of a timely notice of appeal." **Commonwealth v. Green**, 862 A.2d 613, 615 (Pa. Super. 2004) (*en banc*) (citation omitted).

- 4 -

sentence motion was denied by operation of law 120 days later: on November 15, 2022.

When a post-sentence motion is denied by operation of law, Pa.R.Crim.P. 720 requires the clerk of court to enter an order, on behalf of the trial court, stating the motion is denied by operation of law and serve a copy of the order on the parties. Pa.R.Crim.P. 720(B)(3)(c). Here, the docket reflects the clerk of courts entered no such order.

Appellate courts cannot extend the time for filing an appeal. Nevertheless, Pa.R.A.P. 105 provides that

> [a]n appellate court for good cause shown may upon application enlarge the time prescribed by these rules or by its order for doing any act, or may permit an act to be done after the expiration of such time, but the court may not enlarge the time for filing a notice of appeal, a petition for allowance of appeal, a petition for permission to appeal, or a petition for review.

Pa.R.A.P. 105(b). The official note to Rule 105 recognizes an exception to this rule: "Subdivision (b) of this rule is not intended to affect the power of a court to grant relief in the case of fraud **or breakdown in the processes of a court**." *Id.* note (emphasis added).

This Court has held,

> where the clerk of courts does not enter an order indicating that the post-sentence motion is denied by operation of law and notify the defendant of same, **a breakdown in the court system has occurred** and we will not find an appeal untimely under these circumstances.

*Commonwealth v. Perry*, 820 A.2d 734, 735 (Pa. Super. 2003) (emphasis added); *see also Commonwealth v. Braykovich*, 664 A.2d 133, 137-38

- 5 -

(Pa. Super. 1995) (in a case applying the predecessor to Rule 720, deeming an appellant's notice of appeal timely filed, as it was filed within 30 days of the trial court's untimely order denying appellant's post-sentence motion).

Instantly, Appellant filed his notice of appeal within 30 days of the trial court's untimely order denying his post-sentence motions. Applying the reasoning of *Perry* and *Braykovich*, we conclude a breakdown in the trial court's processes excuses Appellant's untimely filing. *See Perry*, 820 A.2d at 735; *Braykovich*, 664 A.2d at 138. Accordingly, we address Appellant's issues.

Appellant presents the following issues:

a) Did the suppression court err by denying [] Appellant's motion to suppress[,] where [] Appellant's arrest was preceded by an illegal detention?

b) Was the evidence insufficient as a matter of law to sustain the conviction for possession of a firearm prohibited?

Appellant's Brief at 5.

Appellant first challenges the trial court's denial of his suppression motion. Appellant's Brief at 20. Our review of the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Wright*, 224 A.3d 1104, 1108 (Pa. Super. 2019). Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth

and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *See id.*

> Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the trial court are subject to plenary review.

*Id.* (brackets and ellipsis omitted).

> In challenging the denial of his suppression motion, Appellant claims,

> [t]he forced traffic stop of the van in this case, which occurred several hours after the shooting incident and was described as a high-risk felony stop by officers, lacked the requisite reasonable suspicion necessary for the investigative detention, rendering illegal the subsequent arrest of [] Appellant as the fruit of the poisonous tree.

Appellant's Brief at 20.

Appellant argues the forcible stop of a vehicle "constitutes a second-level seizure, or investigative detention," triggering the protections of the Fourth Amendment to the United States Constitution. *Id.* at 21. Appellant points out that during a traffic stop, an officer may check

> vehicle registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license[] or secure such other information as the officer may reasonably believe necessary to enforce the provisions of the [Motor Vehicle Code].

*Id.* at 22 (quoting 75 Pa.C.S.A. § 6308(b)).

Appellant claims the police improperly relied on an anonymous tip in detaining Appellant:

[W]hen officers were informed of an anonymous call that suggested [] Appellant was involved in a shooting from the night before, and they, moments later, observe [] Appellant with no suspicious activity – certainly not observing an assault rifle in his passion – they fail to possess the requisite reasonable grounds to justify their detention of [] Appellant at that time….

*Id.* at 26.

Appellant asserts that the surveillance video, viewed by Officer Warren, did not show the suspect reentering the van after the shooting. *Id.* at 26-27. Appellant emphasizes the officers set up surveillance of the van 10 hours after the shooting. *Id.* at 27. Appellant argues officers conducted a "felony stop" of the vehicle five minutes after they received an anonymous tip of Appellant's involvement, and after Bryant Binns and Appellant had entered the van. *Id.* According to Appellant, "it is clear … that officers only engaged the occupants of the van after the anonymous tip was received by [New Castle Police] Chief [Robert] Salem that implicated Appellant[.]" *Id.* at 28. Appellant asserts the anonymous tip is the "lone piece of evidence" gathered at the scene, and there was no way to ascertain its credibility before Appellant was detained. *Id.* at 28-29. Further, Appellant claims the van on Dushane Street was not identified as "identical" to the van at the shooting scene, and there was no evidence that a firearm was still located within the vehicle. *Id.* at 29.

The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from being

- 8 -

subjected to unreasonable searches and seizures. ***Commonwealth v. Thomas***, 273 A.3d 1190, 1195 (Pa. Super. 2022). "Not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections." ***Commonwealth v. Adams***, 205 A.3d 1195, 1199 (Pa. 2019). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." ***Id.*** (quoting ***Florida v. Bostick***, 501 U.S. 429, 434 (1991), in turn quoting ***Terry v. Ohio***, 392 U.S. 1, 19 n.16 (1968)).

Interactions between police and members of the public are classified into three categories: mere encounters, investigative detentions, and custodial detentions. ***Adams***, 205 A.3d at 1199-1200; ***Commonwealth v. Dix***, 207 A.3d 383, 388 (Pa. Super. 2019). A mere encounter, sometimes referred to as a consensual encounter, can be any formal or informal interaction between an officer and citizen and does not need to be justified by any level of police suspicion. ***Adams***, 205 A.3d at 1199; ***Dix***, 207 A.3d at 388. An investigative detention "carries an official compulsion to stop and respond" and must be supported by reasonable suspicion of unlawful activity. ***Dix***, 207 A.3d at 388 (citation omitted). Finally, a custodial detention, which must be based upon probable cause that the individual has committed or is committing a crime, occurs "when the nature, duration and conditions of an investigative detention become so coercive as to be,

practically speaking, the functional equivalent of an arrest." *Id.* at 388 (citation omitted).

An investigative detention, by definition, encompasses only a "brief detention." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("In *Terry*[], we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."). Unlike a mere encounter, an investigative detention constitutes a seizure of a person. *Adams*, 205 A.3d at 1199-1200; *Thomas*, 273 A.3d at 1196.

> [T]o conduct an investigatory stop, the police must have reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30. … [T]o determine whether the police had reasonable suspicion, the totality of the circumstances—the whole picture—must be considered. *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 … (1981). "Based upon that whole picture[,] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at 417-[18.] … If either the seizure (the initial stop) or the search (the frisk) is found to be unreasonable, the remedy is to exclude all evidence derived from the illegal government activity. The *Terry* totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters.

*Commonwealth v. Simmons*, 17 A.3d 399, 402-03 (Pa. Super. 2011) (some citations, quotation marks and brackets omitted; paragraph break omitted).

> [T]he fundamental inquiry is an objective one, namely, whether the facts available to police at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate. Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to

detaining an individual. … While reasonable suspicion is a less stringent standard than probable cause, the detaining officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.

*Commonwealth v. Jefferson*, 256 A.3d 1242, 1248 (Pa. Super. 2021) (citations and quotation marks omitted). "A consideration the totality of the circumstances includes such factors as tips, the reliability of any tips, location and suspicious activity." *Commonwealth v. Muhammad*, 289 A.3d 1078, 1087 (Pa. Super. 2023).

Appellant claims the officers effectuated a traffic stop on the van.

During a traffic stop, it is inherently reasonable for an officer to order the driver of the vehicle to alight from the car. Further, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. For their safety, police officers may handcuff individuals during an investigative detention.

*Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023) (citations and quotation marks omitted).

With this in mind, we consider the evidence of the Commonwealth, and so much of the evidence for the defense as remains uncontradicted, when read in the context of the record as a whole. *See Wright*, 224 A.3d at 1108. At the suppression hearing, Officer Warren testified that, while working the midnight shift on June 26, 2019, he was dispatched to Double D's. N.T. (Suppression), 9/11/19, at 3-4. According to Officer Warren, an anonymous caller had reported "someone across from the courthouse with a semi-auto

rifle threatening to shoot the bar[.]" *Id.* at 28. The caller reported hearing six gunshots. *Id.*

Upon arriving at the scene, Officer Warren went to the parking lot behind the bar, "where they said the male was alleged at and [to] see[] if I could locate anything." *Id.* at 4. In the parking lot, Officer Warren observed no damage or bullet holes from gun fire on the parked vehicles. *Id.*

Officer Warren spoke with Daniel Bruno, the owner of Double D's. *Id.* at 5. Mr. Bruno reported "a black male was behind the bar shooting an assault-style rifle in the air." *Id.* According to Officer Warren, Mr. Bruno

> brought me behind the bar where there … some type of garage
> back there. Behind the garage where there's rocks and like mulch
> or like shrubbery. There [were] four shell casings, 223 shell
> casings.

*Id.* Mr. Bruno described one of the men involved in the shooting as a black male wearing a black shirt and blue jeans. *Id.*

Officer Warren also spoke with an employee of the bar, Ms. Gravatt. *Id.* at 6. Ms. Gravatt

> stated that there was a male that went by the  nickname of "D"
> that was arguing with a few other males outside of the … bar right
> in front of the main door.
>
> ….
>
> [Ms. Gravatt] did not give [Officer Warren] any names, but she
> said there was a group of black males that were fighting[,] and
> she viewed a white van pull up in front of the main door and there
> was an altercation that ensued with people outside of the vehicle.
> … [S]he stated that she went outside and tried to break up the
> fight and when … it wasn't helping the situation, she came back
> inside and then she said a male exited the van.

- 12 -

*Id.* at 6-7.

Officer Warren testified to viewing a surveillance video of the altercation. *Id.* at 7. In that video, Officer Warren observed a White Dodge Caravan pulling up to the bar. *Id.* According to Officer Warren,

> [a]n argument ensued with a couple of black males wearing white T-shirts right outside the passenger side door. It was merely a shoving match at that point. At one point[,] a male took off his shirt and engaged into a physical fight outside in … the middle of … East Washington Street and then at one point the male with no shirt came around to the passenger side sliding door, attempted to open the sliding door, it did not open. There was more [] of an altercation and then, again, [he] opened the door again. At that time, a black male wearing a black shirt and blue jeans exited the vehicle with an AR-15 style rifle.
>
> ….
>
> After that, … the male exited the vehicle with … [the AR-15 rifle] in his hand, like taunting with it. He did walk around the rear … of the van, into the middle of East Washington Street. At that point, he did retreat towards the back of the building, which was off camera from the front camera view.

*Id.* at 7-8.

Officer Warren used an application on his phone (Axon Capture) to save a photo of the van directly to his "body camera cloud."[7] *Id.* at 8. Officer Warren sent his screen capture in a department-wide email, along with a description of the video. *Id.* at 10. Officer Warren described the screen capture as depicting damage to the passenger side fender where it meets the

---

[7] Officer Warren's screen capture of the van was entered into evidence as Commonwealth's Exhibit 1. *Id.* at 8-9.

- 13 -

passenger door. *Id.* at 13. Officer Warren's email indicated the vehicle had been involved in a shooting at Double D's and noted the damage to the van's passenger-side door. *Id.*

> Officer Warren also viewed surveillance video of the rear of the building,
>
> where the male retreated to the back. I saw him walking between the cars and the back of the building, pause[] for a moment and then went off camera to where … the shell casings were located.

*Id.* at 9-10.

Corporal Hallowich testified that he reported to work at 8:00 a.m. the same day as the shooting incident. *Id.* at 14-15. Corporal Hallowich heard about the incident via Officer Warren's email and from Officer Austin Pagley. *Id.* at 15. According to Corporal Hallowich,

> [w]hen I came in, based on the nickname D, we searched some locations, some known people to the [police] department that go by that and that was unsuccessful. I received a call from Officer Pagley. And he advised that he though he located the vehicle on Dushane Street just off of Lutton.

*Id.* As a result of that information, Corporal Hallowich responded to the area. *Id.* at 16.

> Corporal Hallowich explained,
>
> Because we, at that point, didn't have any suspicions on actors or anything, I advised Officer Pagley to stay out of the area, but try to maintain eye contact with the vehicle, and myself and Corporal Buswell set up surveillance in the area.

*Id.* Police Officer James Paglia informed Corporal Hallowich that

> recent to that day, [Officer Paglia] was at 1008 Dushane Street for a domestic disturbance between Bryant Binns and Eileen

- 14 -

Bower, and … the van was parked directly in front of [the residence].

*Id.*

Corporal Hallowich testified that, around 10:30 or 11:00 that morning, police surveilled the van for about 25 minutes before observing someone walk out of the 1008 Dushane Street residence. *Id.* at 21, 23.

> As we sat in the area watching the vehicle, Corporal Buswell contacted me, advised that Chief Salem had received a phone call that [Appellant] was possibly the shooter from Double D's. There was a white male who I recognized as Gerald Greenham. He was in the back of the vehicle moving tools. A short time later, Bryant Binns and [Appellant] exited the front door of the residence and set the[m]selves in the vehicle.

*Id.* at 16-17. Corporal Hallowich described the vehicle under surveillance as a white Dodge Caravan. *Id.* at 17. According to Corporal Hallowich, it appeared to be the same vehicle described in Officer Warren's email. *Id.*

Corporal Hallowich admitted the email provided no year, license number, or owner for the Dodge Caravan. *Id.* at 22-23. According to Corporal Hallowich, the officers were unable to ascertain the license number during their surveillance, because the van's rear hatch door was open. *Id.* at 23. Corporal Hallowich testified the rear hatch remained open "[r]ight up until Mr. Greenham closed it and got in the vehicle and then Mr. Binns and [Appellant] exited the residence." *Id.* at 22.

Corporal Hallowich described what next transpired:

> At that point, we wanted to detain everybody. And we were actually on the phone as they exited the residence. And we decided rather than let the vehicle pull away and possibly get into

- 15 -

a vehicle pursuit, something to that effect, we just would approach the vehicle then before it could even roll.

….

It was a felony vehicle stop based on the information that a firearm was used[,] and this vehicle closely matched the description that Officer Warren gave to us. We did a felony vehicle stop on it. I approached from the front. Corporal Buswell approached from the rear. We drew our firearms, ordered everybody to just stay seated … until we got backup units, and then everybody was removed from the vehicle and detained.

*Id.* at 17-18. In describing his reason for detaining Appellant, Corporal Hallowich explained that Appellant and Bryant Binns, or both, had "as least, been mentioned as suspects" in recent shootings. *Id.* at 18-19.

After Appellant and the other individuals exited the vehicle,

they were handcuffed and all separated away from each other and placed into police vehicles. Aside from Mr. Greenham, [who] has severe health issues, he was taken aside and seated on a wall.

*Id.* at 20. Corporal Hallowich testified,

as soon as the occupants of the vehicle were removed[,] Mr. Binns said I know why you're here. I'll tell you whatever you want to know or something to that effect. They walked away from the vehicle. That's when Mr. Binns was *Mirandized* and Corporal Buswell questioned him, which I wasn't present for, but the information provided to me that I put in the warrant was that Mr. Binns had said that Eileen Bower, the owner of the residence, told him that [Appellant] returned with a rifle later.

*Id.* at 30.

Before obtaining a search warrant, Corporal Hallowich entered the residence. *Id.* at 31. He explained:

[T]ypically what we would do on a search warrant for narcotics or something that can be destroyed, you would clear the residence

- 16 -

to make sure there's no other occupants because that evidence can be destroyed. A firearm can't be destroyed, but based on the fact that a firearm was used which led us to the residence to begin with, we were worried for officer safety outside that that firearm could be used against us by any other occupants inside.

….

… Officer Lewis advised that he thought he heard somebody inside from what would be the south side of the residence.

*Id.* at 31-32. Corporal Hallowich confirmed officers applied for and received a search warrant for the 1008 Dushane Street residence.[8] *Id.* at 21.

Chief Salem testified that he arrived at 1008 Dushane Street as a passenger in Officer Buswell's vehicle. *Id.* at 34-35. Before arriving at the scene, and while in Officer Buswell's vehicle, Chief Salem received an anonymous phone call naming Bryant Binns and Appellant as participants in the shooting incident. *Id.* at 36. According to Chief Salem, "It's not uncommon for me to get calls after an incident saying this is the word on the street, and that's what happened in this case." *Id.*

Corporal Buswell testified that he accompanied Chief Salem. *Id.* at 42. He testified, "After the initial high-risk stop was performed, other officers did arrive on scene and that's when we removed the individuals from the vehicle." *Id.* at 43. Corporal Buswell testified regarding his encounter with Bryant Binns:

_____

[8] The search warrant for the residence was admitted into evidence as Commonwealth's Exhibit 2. *Id.*

- 17 -

> As [Mr. Binns] was being removed from the vehicle and secured, he made several statements to me[:] I know why you're here, I know what this is about, I'll tell you whatever you want to know. That being said, once he was secured in the back of the police vehicle, I called a patrol officer over with a body-worn camera and I ***Mirandized*** Mr. Bins … and spoke to him about the incident.
>
> ….
>
> [Mr. Binns] stated that he was at Double D's [] for the incident the prior night or prior evening involved [*sic*] the shooting and he explained to me [that Appellant] … was the one that had the assault-style rifle and the one that fired the shots off at the bar.
>
> ….
>
> … He explained to me that his girlfriend, Miss Bower, who was the resident at 1008 Dushane [Street], … told him that [Appellant] had returned to the … residence with the firearm the previous night.

***Id.*** at 44. Corporal Buswell testified he was provided information that the firearm used at Double D's was presently inside of the residence at 1008 Dushane Street. ***Id.*** at 45.

The Commonwealth additionally presented the videotaped admission of Appellant, taken after he was ***Mirandized***. ***Id.*** at 46. Corporal Buswell indicated Appellant showed no signs of intoxication or being "under the influence." ***Id.*** at 52-53.

Viewing the totality of the circumstances, the officers' investigative detention of Appellant was supported by the requisite reasonable suspicion. Although Appellant claims the officers improperly relied on the anonymous tip, our review discloses they considered it as part of the totality of the circumstances. Officers found a van matching the description of a vehicle

used in the Double D's shooting incident; they observed Appellant and Mr. Binns enter the van; they received an anonymous tip that Appellant and Mr. Binns were involved in the incident; and they viewed surveillance video of the person involved the shooting exiting the van with a firearm. Under the totality of the circumstances, the officers' investigative detention of Appellant was supported by reasonable suspicion of his involvement in criminal activity.

Finally, officers' subsequent search of 1008 Dushane Street residence was supported by probable cause. Mr. Binns confirmed Appellant's involvement in the shooting, and that the firearm used in the shooting was inside the 1008 Dushane Street residence. Under these circumstances, we discern no error or abuse of discretion in the denial of Appellant's suppression motion.

Appellant next challenges the sufficiency of the evidence underlying his conviction. Appellant's Brief at 30. Appellant claims that the only evidence of his possession of the firearm is his own statement to police. *Id.* at 32. Appellant argues the Commonwealth "cannot prove the *corpus delicti* that [Appellant] physically possessed the [firearm]. *Id.* at 33. Appellant directs our attention to the testimony of Gravatt and Bruno, who both denied seeing Appellant with a firearm. *Id.* Further, Appellant argues, uncharged co-conspirator Mr. Greenham could not testify beyond a reasonable doubt that the rifle found at 1008 Dushane Street is the same firearm used in the shooting. *Id.* According to Appellant,

[i]n fact, Greenham could not state that he observed [] Appellant return the rifle at any point to the van, nor to 1008 Dushane Street[,] when he dropped Appellant off….

*Id.* Finally, Appellant points out the Commonwealth presented no scientific evidence matching the spent shell casings found at the shooting scene to those found in the firearm recovered from the Dushane Street residence. *Id.* at 34.

Appellant additionally argues the Commonwealth failed to demonstrate his "constructive possession" of the firearm. *Id.* at 34-35. According to Appellant,

there was no scientific analysis to show that [] Appellant's DNA or fingerprints were on the rifle or ammunition. Additionally [Appellant's] mere presence [] exiting 1008 Dushane Street before apprehension and the police discovery of the rifle therein is similarly insufficient evidence….

*Id.* at 35.

When reviewing a sufficiency challenge,

we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain this burden by means of wholly circumstantial evidence.

*Commonwealth v. Johnson*, 107 A.3d 52, 66 (Pa. 2014) (quotation marks and citations omitted). "In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder."

*Commonwealth v. Miller*, 172 A.3d 632, 640 (Pa. Super. 2017) (citation omitted).

> The Crimes Code provides:
>
> A person who has been convicted of an offense enumerated in subsection (b) … or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer[,] or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1). The term "firearm" is defined in Section 6105(i) as any weapon that is "designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any such weapon." *Id.* § 6105(i).

When contraband is not found on the defendant's person, "the Commonwealth must establish constructive possession…." *Commonwealth v. Jones*, 874 A.2d 1008, 121 (Pa. Super. 2005) (citation omitted). "Constructive possession is the ability to exercise conscious control or dominion over the illegal substance and the intent to exercise that control." *Id.* "The intent to exercise conscious dominion can be inferred from the totality of the circumstances." *Id.*

> It is well established that, as with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

*Commonwealth v. Parrish*, 191 A.3d 31, 36-37 (Pa. Super. 2018).

In its opinion, the trial court concluded Appellant's sufficiency challenge

lacks merit:

> The evidence adduced at trial established that [Appellant] admitted in police interviews after being ***Mirandized*** that the AR-15 rifle was in a black duffel bag at his feet in the backseat of a vehicle, of which he was the only occupant other than the driver; that he picked up the rifle and threw it in the bushes after the incident; and that he returned later on in the night with a headlamp in order to retrieve it from the scene of the incident. N.T., 3/23/22, at []1-12….

Trial Court Opinion, 12/2/22, at 6 (punctuation modified, footnote omitted).

As the trial court explained,

> [t]estimony from … Gerald Greenham[] was heard indicating that [Appellant] possessed a black duffel bag in the backseat of Greenham's white van[,] which was suspected to contain the AR-15 rifle on the night of the incident in question. N.T., 3/22/22, at 145-46. Greenham further testified that at the moment of the altercation, he witnessed [Appellant] reach into the backseat of the van and retrieve what he believed to be a rifle based on his prior experience with hunting and heard what he believed was three gunshots. [***Id.***] at 147-48. Greenham also indicated that after the gunshots, he drove away from the scene without [Appellant], but later picked [Appellant] up, brought him to back to the scene of the incident in order to "look[] for that gun" and then dropped [Appellant] off at the Dushane Street residence where [Appellant] was arrested. [***Id.***] at 149-51….

Trial Court Opinion 12/2/22, at 6 (punctuation modified).

In addition,

> Witness Tonya Gravatt testified to seeing a black male exiting the passenger side of a white van with a gun, then hearing "five or six" gunshots. N.T., 3/22/22, at 41-42. Upon reviewing the surveillance footage upon responding to the scene, Officer Warren testified to finding "four spent .223 shell casings" outside the bar, which were admitted into evidence as Commonwealth's Exhibit 5. [***Id.***] at 66-68.

> … Detective Buswell received information from witnesses throughout the course of his investigation that [Appellant] returned the rifle to Dushane Street on the night in question, prior to his arrest there the next day. N.T., 3/23/22 at 18, 28. Conversely, [Appellant's] testimony at trial was that every admission he made in his interview with police was made up in order to cover up for the actual perpetrator at the scene of the incident, and that [Appellant] was under the mistaken belief that one of the persons he was arrested with was actually a criminal informant who could have any charges related to his "admissions" dropped due to his status as such. [*Id.*] at 57.

Trial Court Opinion, 12/2/22, at 8 (punctuation modified).

Detective Hallowich testified that, while executing a search warrant at 1008 Dushane Street, he found an AR-15 firearm under a couch cushion. N.T., 5/22/22, at 96-97. Detective Hallowich testified, "There was no indication on the rifle that it would not be operable." *Id.* at 103. In fact, Detective Hallowich testified that he test-fired the weapon. *Id.* at 105. He indicated the rounds recovered from the AR-15 are the same as those recovered from the shooting scene. *Id.* at 104.

> The trial court concluded,
>
> viewing the evidence presented at trial in the light most favorable to Commonwealth as the as the verdict winner, there was sufficient evidence to enable jury to find every element of the crime beyond a reasonable doubt. [Appellant] is not entitled to a new trial, nor a judgment of acquittal.

Trial Court Opinion, 12/2/22, at 8. Based on the foregoing, we agree with the trial court's assessment. Appellant's second issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/10/2023